Seth Lehrman [CSBN 178303]
Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.
425 North Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Tel.: 954-524-2820
Fax: 954-524-2822
E-mail: seth@pathtojustice.com

Steven F. Grover [Pro Hac Vice]
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel.: 954-356-0005
Fax: 954-356-0010
E-mail: lawhelp@earthlink.net

Attorneys for Plaintiffs Obelia Villaflor & Kay Brice,
individually and on behalf of the Settlement Class

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

| | |
|---|---|
| OBELIA D. VILLAFLOR and KAY B. BRICE, individually, and on behalf of all similarly situated individuals, | Case No. 3:09-CV-00329-MMC |
| | Hon. Maxine M. Chesney |
|       Plaintiff, | MEMORANDOM IN SUPPORT OF THE APPLICATION OF PLAINTIFFS' COUNSEL FOR ORDER GRANTING APPLICATION FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS |
|   v. | |
| EQUIFAX INFORMATION SERVICES, LLC, | |
|       Defendant. | Hearing:  April 29, 2011 at 9:00 a.m. Place:  Courtroom 7, 19th Floor |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................. 4

        A.      History of the Litigation............................................................................ 4

        B.      The Settlement Requires Meaningful Changes to Equifax File Disclosures .......... 6

        C.      In-Kind Settlement Benefits Confer Significant Value to Class ........................... 7

III.    ARGUMENT ....................................................................................................... 7

        A.      The Requested Fee is the Result of Arm's Length Negotiations............................ 7

        by Experienced Counsel ..................................................................................... 7

        B.      The Requested Fee Is Reasonable Under the Lodestar Method ............................ 8

                1.      Plaintiffs' Counsel's Hourly Rates are Reasonable ....................................... 10

                2.      The Number of Hours Plaintiffs' Counsel Worked is .................................... 11

                Reasonable .................................................................................................. 11

        C.      The *Kerr* Factors Further Demonstrate the Reasonableness of the Requested Fee
                15

                1.      Plaintiffs' Counsel Have Achieved Significant Relief for the Class ............. 15

                2.      Fee Awards in Similar Cases Are Consistent with the Award Agreed Upon by
                        the Parties in this Action ................................................................................. 17

                3.      Plaintiffs' Counsel Bore Significant Risk Due to the Contingent Nature of the
                        Fee ................................................................................................................... 17

        D.      A Percentage of Common Fund Cross-Check Further Supports the
                Reasonableness of the Fee Request ..................................................................... 19

IV.     Service Awards to the Named Plaintiffs Are Appropriate............................................ 20

V.      CONCLUSION.................................................................................................... 22

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Table of Authorities

## Cases

*Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006) ..................................... 10

*Barrios v. Cal. Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002) .............................. 17

*Blum v. Stenson*, 465 U.S. 886, 895 (1984) ...................................................... 10, 11, 13

*Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27, 32 (E.D. Pa. 1985)............................... 23

*Buckhannon Bd. & Care Home Inc. v. West Virginia Dept. of Health & Human Res.*, 532 U.S. 598, 604-05 (2001)........................................................................ 16

*Camacho v. Bridgeport Financial, Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) ............................... 11

*Carroll v. Blue Cross & Blue Shield of Mass.*, 157 F.R.D. 142, 143 (D. Mass. 1994), *aff'd* 34 F.3d 1065 (1st Cir. 1994).......................................................... 23

*Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1028 (9th Cir. 2000)................................... 9

*Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 666-67 (7th Cir. 2001) ........................................ 16

*Fulford v. Logitech*, 2010 WL 807448 (N.D. Cal.) ................................................ 12

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 ..................................................... 9, 17

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ...................................................... 8, 9

*Hughes v. Microsoft Corp.*, F. Supp. 2d, 2001 WL 34089697, 2001 U.S. Dist. LEXIS 5976, at *36-38 ........................................................................... 23

*In re Apple Computer, Inc. Derivative Litig.*, 2008 U.S. Dist. LEXIS 108195, at *12 (N.D. Cal. November 5, 2008). ..................................................... 8

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000)........................................ 22

*Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001)................................... 8

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)). ......................................... 10

*Labotest, Inc. v. Bonta*, 297 F.3d 892, 895 (9th Cir. 2002............................................. 17

*Levine v. City of Alameda*, 2006 WL 1867532, * 2-3 (N.D. Cal. 2006)...................................... 17

*Nagle v. Experian Info. Solutions, Inc.*, 297 F.3d 1305, 1307 (11th Cir. 2002)........................... 16

*Quesada v. Thomson*, 850 F.2d 537, 540 (9th Cir. 1988)........................................... 18

*Razilov v. Nationwide Mut. Ins. Co.*, No. 01-CV-1466-BR., 2006 WL 3312024, *3-*4 (D. Or. Nov. 13, 2006) ...................................................... 23

*Richard S. v. Dept. of Developmental Servs.*, 317 F.3d 1080, 1087 (9th Cir. 2003).................. 17

*Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) ........................................................ 9, 22

*Stevens v. Safeway, Inc.*, 2008 U.S. Dist. LEXIS 17119 (C.D. Cal. 2008) ................................. 23

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990)).......... 11

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-1049 (9th Cir. 2002) .................................... 9

**Statutes**

15 U.S.C. § 1681n............................................................................................................................. 7

15 U.S.C. §§ 1681n (a) (3)............................................................................................................. 12

1681o(a)(3) .................................................................................................................................... 12

**Rules**

Fed.R.Civ.P. 30(b)(6)....................................................................................................................... 7

**Treatises**

Manual for Complex Litig., § 21.62 n.971 (4th ed. 2004)............................................................ 15

## I.     <u>INTRODUCTION</u>

Plaintiffs' Counsel submit this uncontested motion for an award of attorneys' fees and expenses totaling $1,380,000, and service awards of $10,000 each to the two class representatives for the services they have rendered to the Class throughout the litigation resulting in a valuable Settlement.  The requested amount of $1,380,000 includes both attorneys' fees and expenses, and will be paid, subject to the Court's approval, by Equifax Information Services, LLC ("Equifax"), in addition to (and not out of) the relief made available to the Class.  After reimbursement of $72,318.70 of expenses[1], the remainder for fees is $1,307,681.30.  Thus, the requested fee reflects a discount on Plaintiffs' Counsel's combined lodestar of $1,528,099, generated through 3,762.5 hours of work on this case since its inception more than three years ago.

Through more than three years of diligent work by Plaintiffs' Counsel, core policies of the Fair Credit Reporting Act, 15 U.S.C. Sec. 1681 *et seq*. ("FCRA") have been enforced and very substantial benefits will be conferred upon the Settlement Class and the public at large by the proposed Settlement.  The FCRA requires that upon request, credit reporting agencies must "clearly" and "accurately" disclose to consumers all information in their credit file. 15 U.S.C. Sec. 1681g(a)(1).  This disclosure of clear and accurate credit information to consumers is vital to permit consumers to verify the accuracy of their credit files and to exercise their right under the FCRA to dispute any inaccuracies found in their file.  In this action, Plaintiffs claimed that Equifax, one of the major three national credit reporting agencies, had a systematic practice of providing file disclosures to consumers which failed to "clearly" and "accurately" state the "current status" of certain paid and closed accounts.

Through the efforts of Plaintiffs' Counsel, Equifax Information Services, LLC ("Equifax") has agreed to change the content and format of file disclosures to provide <u>clear</u> and <u>accurate</u> disclosure and explanation of "current status" information, including clear disclosure to

---

[1] Plaintiffs' Counsel estimate that they will reasonably expend at least an additional five thousand dollars of expenses through the April 29, 2011 final approval hearing.  Thus the total expenses are likely to exceed $80,000. See Declaration of Seth Lehrman [D.E. __], ¶ 14.

consumers of the date to which the status information relates. This relief is particularly important to consumers who, like the named Plaintiffs, had a history of late payments on accounts that they subsequently paid off and closed. The prospective change to Defendant's file disclosures will allow consumers to understand the reported status of their accounts and to understand that this status may not be "current" but rather relates to a particular date in the past. Moreover, this enhanced and improved format of file disclosures will facilitate consumers exercising their right to dispute inaccuracies through the FCRA's reinvestigation procedure, a core right under the Act.

Plaintiffs' claims and the proposed Settlement address several of the FCRA's core policies. It is vital that consumer credit reports be accurate. The need for this accuracy is reflected in the following Congressional findings set forth in the FCRA:

> The banking system is dependent upon fair and **accurate** credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system. 15 U.S.C. § 1681(a)(1)(emphasis added).

The 1996 amendments to the FCRA, amongst other things, gave consumers the right to request a copy of their credit file. Since then, consumer file disclosures have been a principal mechanism, under the FCRA, for improving the accuracy of consumer reports.

This prospective relief, agreed to by Equifax with Plaintiffs, is "groundbreaking" and will have a direct impact on the millions of consumers who receive their file disclosures from Equifax annually. Consumers with paid and closed accounts, that were once past due, will now more readily understand the true status of their accounts when they review their Equifax file disclosures. In addition, millions of dollars of credit monitoring relief will be made available which will enable Class Members to identify and remedy any inaccuracies in their credit files. This combination of settlement remedies – substantive changes to file disclosures and free access

1  to valuable credit monitoring products – represent a common and <u>approved</u> combination of

2  settlement remedies in FCRA class action settlements focused on alleged file disclosure claims.[2]

3          These results warrant the award of attorneys' fees and costs requested by Plaintiffs'

4  Counsel.  Defendant has recognized this in entering into the Settlement Agreement (DE 131-1).

5  This Agreement is the result of extensive, arm's-length negotiations.  The negotiated amount for

6  fees and costs totals $1,380,000 plus the incentive awards of $10,000 to each class representative

7  for the services they have rendered to the Class.  Plaintiffs' Counsel requested amount of

8  $1,380,000 is inclusive of both attorneys' fees and expenses, and will be paid, subject to the

9  Court's approval, by Defendant as provided in Paragraph 5.1 of the Settlement Agreement.  As

10 more fully explained below, the "reasonableness" of the amounts is appropriately determined by

11 application of the lodestar methodology since Paragraph 5.1 represents the resolution of

12 Equifax's liability for attorneys' fees and expenses pursuant to the FCRA's statutory fee-shifting

13 provision.  Plaintiffs' fee request is based upon a lodestar calculation which demonstrates the

14 reasonableness of the requested fee.  Furthermore, a "percentage of the value" of the settlement

15 "cross-check", further demonstrates that this request is "reasonable" because it represents a small

16 fraction of the total value of relief made available by the settlement.

17         The requested award is fair and reasonable and thus should be approved.  While an

18 agreement between the parties regarding fees and expenses is not binding on the Court, such an

19 agreement is entitled to great weight where, as in this case, the fee negotiations were conducted

20 at arm's length and only after the merits of the litigation were settled.  This is particularly true

21 here since the benefits that Class Members will receive will not be reduced by the Court's

22 decision, since Defendant has agreed to pay attorneys' fees and expenses over and above the

23 settlement relief to be provided to the Class.  Indeed, the only party that would benefit by a

24 reduction in the requested fee is the Defendant, which would be ironic given that Defendant has

25 agreed to pay the requested fees and expenses.

26

27 _____

[2] *See Declaration of Seth Lehrman* ("*Lehrman Decl.*"), ¶ 40 discussing settlements of other
FCRA class action cases.

28

## II.   BACKGROUND

### A.  History of the Litigation

The history of the litigation is set forth fully in the Lehrman Decl.  Over three years ago, Plaintiffs' Counsel began its investigation into the factual and legal circumstances of this case. *Lehrman Decl.*, ¶ 7 and 19. The investigation included interviews with class representative Obelia Villaflor, extensive research into the FCRA, its history, its legislative history, caselaw interpreting the relevant provisions of the FCRA, and extensive research on Equifax and its practices relating to their creation of file disclosures and consumer reports. *Id*. The Complaint was filed in the Central District of California in March, 2008. *Id*., ¶ 20.

Plaintiff asserted two causes of action for willful violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq*. ("FCRA") against Equifax. *Id*., ¶ 5; Complaint [D.E. 1].  The Complaint[3] alleged two claims under the Fair Credit Reporting Act ("FCRA").  Count I alleged that Defendant violates the FCRA (15 U.S.C. § 1681e(b)) by providing "consumer reports" (credit reports issued to credit grantors) which inaccurately reflect that "paid and closed" accounts have a "current status" of thirty to one-hundred-and-twenty days "Past Due" which results in credit grantors judging Plaintiffs and Class Members to have diminished credit worthiness. *Lehrman Decl.*, ¶ 20.  Count II alleged that Equifax violated the file disclosure provision, 15 U.S.C. § 1681g(a)(1), by failing to clearly and accurately disclose the "current status" and/or "status" fields of certain tradelines. Fourth Am. Complt. [D.E. 90].  At all times Equifax has maintained that that its files properly disclosed the "current status" and/or "status" of the subject tradelines and that it acted in good faith and without intent to harm any members of the class. Answer to Fourth Amd. Complt. [D.E. 91]; *See Lehrman Decl*., ¶ 21.  Plaintiffs' claim were limited to the recovery of statutory damages under 15 U.S.C. § 1681n, which provides that any person who *willfully* fails to comply with any requirement imposed under the Act is liable

---

[3] Plaintiffs filed amended complaints, as follows: on April 30, 2008, Plaintiff filed a First Amended Complaint [D.E. 17]; on October 10, 2008, Plaintiff filed a Second Amended Complaint [D.E. 47]; on November 12, 2009 Plaintiff filed a Third Amended Complaint [D.E. 81] adding Kay B. Brice as a second plaintiff and class representative; and on March 11, 2010 Plaintiffs filed a Fourth Amended Complaint [D.E. 90] (the "Complaint").

for any actual damages or for statutory damages of not less than $100 and not more than $1,000. Plaintiffs also sought attorneys' fees and expenses.  Fourth Am. Complt. [D.E. 90].

Equifax denied the allegations in the Complaint, denied wrongdoing of any kind, denied that the case satisfies the requirements for class certification under Federal Rule of Civil Procedure 23, and asserted defenses.[4] Answer [D.E. 48].

During the pendency of this litigation, Class Counsel traveled to Orange County and San Francisco to participate in case management conferences. *Lehrman Decl.*, ¶ 22.  Throughout the litigation, Class Counsel engaged in extensive discussions with Defendant regarding the scope of discovery, scheduling, and the nature and extent of the asserted claims. *Id.*  In August 2008, Class Counsel appeared at a case management conference in the Central District of California before the Honorable David O. Carter, before whom the case was pending, along with Plaintiffs' counsel and Defendants' counsel in the consolidated actions *Pike/White/Hernandez*[5], another FCRA class action case that although deemed a "related" case involved distinct issues.[6] *Id.*

On May 12, 2008 Equifax filed an unopposed Motion to Transfer Case to the United States District Court for the Northern District of California. [D.E. 20].  On September 30, 2008, Judge Carter granted the transfer request, transferring the case to the Northern District of California and granting Plaintiff leave to file a second amended complaint.  Order transfer [D.E. 46].

Plaintiffs in the Litigation have undertaken substantial investigation, fact-gathering, and formal discovery. *Id.*, ¶ 24.  The Parties served and responded to significant discovery requests,

---

[4] Defendant likewise responded to each successive amended complaint, denying the material allegations, denying any wrongdoing, denying that the requirements for class certification were met and asserting defenses.

[5] *Terri N. White, et al. v. Experian Information Solutions, Inc.*, Case No. SA CV 05-1070 (Lead Case number); *Terri N. White, et al. v. Equifax Information Services LLC*, Case No. CV 05-7821; *Terri N. White, et al. v. Trans Union LLC*, Case No. CV 05-1073; *Jose Hernandez v. Equifax Information Services, LLC, et al.*, Case No. CV 06-3924; *Jose L. Acosta et al., v. Trans Union LLC, et al.*, Case No. CV 06-5060; and *Kathryn L. Pike v. Equifax Information Services, LLC*, Case No. CV 05-1172 (collectively, "Pike/White/Hernandez").

[6] *Pike/White/Hernandez* involves the reporting on file disclosures and consumer reports of debts that have been discharged in chapter 7 bankruptcy.  Plaintiffs alleged therein that the Defendant credit reporting agencies were systematically violating the FCRA by reporting discharged debts in a way that suggested that these debts had not been discharged.

including requests for production of documents, interrogatories, and requests for admissions. *Id*. Throughout the Action, the Parties held numerous meet-and-confer sessions over the parties' respective discovery requests and the scope of production of documents from parties and non-parties in response thereto. *Id*. As a result of Plaintiffs' discovery requests, Equifax produced thousands of pages of documents. *Id*. Class Counsel methodically reviewed and analyzed all documents produced in this Action. *Id*. The Parties propounded substantial deposition testimony. *Id*. Class Counsel expended time and resources by traveling to depose four Defendant designees under Fed.R.Civ.P. 30(b)(6). *Id*. In addition, Class Counsel defended the named Plaintiffs at various locations during their depositions in the Litigation. *Id*. The Parties also engaged in discovery motion practice, including motions for protective orders and motions to compel. *Id*.

After extensive discovery, investigation, litigation, research, and consultation with retained experts Plaintiffs' counsel determined that there was an insufficient factual basis to continue pursuing the Sec. 1681e(b) claims for damage to credit worthiness premised upon the alleged reporting of status and activity description information in consumer reports issued to credit grantors. *Id*., ¶ 25. Accordingly, Plaintiffs focused thereafter on advancing the file disclosure claims (Fourth Amd. Complt, Count II, ¶¶ 30-34); *Lehrman Decl*., ¶ 25. Plaintiffs had fully researched and briefed a motion for class certification and were prepared to file the motion when the settlement proposed herein was reached. *Id*. In addition, Class Counsel had conducted discovery on the issue of willfulness, as construed under *Safeco*, and had performed extensive research on this issue in anticipation of these issues being raised by Equifax in a class certification context and in a defense summary judgment motion. *Id*.

**B.  The Settlement Requires Meaningful Changes to Equifax File Disclosures**

The Settlement Agreement remedies Plaintiffs' claims by establishing revisions to Equifax's file disclosure format[7] and its website[8], www.equifax.com.  These revisions provide clear methods of disclosure and explanations of the meaning of the "status" field.  This aspect of the proposal is highly significant because it would affect not only the Settlement Class Members, but also tens of millions of persons who request their file disclosure from Equifax on an annual basis.  The file disclosure procedure is crucial in assisting consumers to discover and understand what information is contained in their file, and, if necessary, to correct any inaccuracies.

C.  **In-Kind Settlement Benefits Confer Significant Value to Class**

In addition, the Settlement would provide a meaningful plan for remediating the claims of the approximately 60,000 Settlement Class Members whose file disclosures allegedly did not clearly and accurately disclose the status of paid-and-closed accounts.  The Settlement will provide these Class Members with an automatic, no-cost right to use Equifax's "Credit Watch Gold" product for twelve (12) months.[9]  As its name implies, "Credit Watch Gold" is one of Equifax's premier products.  It includes daily monitoring of a consumer's Equifax credit file, providing alerts for key changes and unlimited access to the consumer's Equifax consumer credit file.  This product also includes identity theft insurance.  This type of remediation is particularly appropriate in this context because it provides a mechanism for Class Members to obtain either electronic or paper copies of their credit files on an ongoing basis to ensure that the information is understood and accurate.

III.  **ARGUMENT**

A.  **The Requested Fee is the Result of Arm's Length Negotiations**
   **by Experienced Counsel**

The requested fee amount is based on extensive post-settlement arm's length negotiations between experienced and highly skilled lawyers for Plaintiffs and Defendant.  "A request for attorney's fees should not result in a second major litigation.  Ideally, of course, litigants will

---

[7] Settlement Agreement, *supra*, ¶ 3.1.
[8] *Id.*, ¶ 3.1.5.
[9] Settlement Agreement, *supra*, ¶ 2.

settle the amount of a fee." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). "A court should refrain from substituting its own value for a properly bargained-for agreement." *In re Apple Computer, Inc. Derivative Litig.*, 2008 U.S. Dist. LEXIS 108195, at *12 (N.D. Cal. November 5, 2008).   Thus, where there is no evidence of collusion and no detriment to the parties, courts "should give substantial weight to a negotiated fee amount, assuming that it represents the parties' 'best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.'" *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001).

Here, the Plaintiffs' Counsel negotiated with Defendant to reach a fee they regarded as reasonable based upon their lodestar.  The fee was properly bargained for without collusion or detriment to the parties.  The negotiated fee amount is also justified by Plaintiffs Counsel's extensive experience and skill in consumer class actions and other complex litigation. *Lehrman Decl.* ¶¶ 3-6 and the following declarations of other Plaintiffs Counsel: Declaration of Steven F. ("*Grover Decl*.") ¶¶ 2-4; Declaration of James S. Knopf ("*Knopf Decl*.") ¶¶ 4-5; Declaration of Robert A. Friedman ("*Friedman Decl*.") ¶¶ 5, 7-8; and Declaration of Joel A. Brown ("*Brown Decl*.") ¶¶ 5, 7-8. (referred to collectively as "*Plaintiffs' Counsel Decls*.").  Plaintiffs' Counsel worked solely on a contingent fee basis, while vigorously pursuing the claims on behalf of the entire Class. *Lehrman Decl.,* ¶; *Grover Decl.* ; *Knopf Decl.,* 8; *Friedman Decl.*, ¶ 10; and *Brown Decl.*, ¶ 10.   Counsel has engaged in meaningful discovery, extensive motion practice, and settlement negotiations.

### B.  The Requested Fee Is Reasonable Under the Lodestar Method

"Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination whether the settlement is 'fundamentally fair, adequate, and reasonable.'" *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P. 23(e)).  The Court has the discretion to use the lodestar method to determine the reasonableness of the requested fees. *See Hanlon v. Chrysler*

*Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) (citing *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-1049 (9th Cir. 2002) ("Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case," including the results achieved for the class, both monetary and non-monetary, and the risk faced by class counsel in prosecuting the case.)

The attorneys' fees are expressly provided for in the Settlement Agreement, filed on November 17, 2010 (DE 131-1) and Defendant does not contest the amount of the award requested by Class Counsel. *Lehrman Decl.*, ¶ 27.  In addition, the fact that these fees would be requested is disclosed to Class Members in the Notice regarding the Settlement. *Id.*, ¶ 28.

The starting point for computing the lodestar amount is to multiply the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate. *See Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1028 (9th Cir. 2000); *see also Hensley v. Eckerhart*, 461 U.S. 424 (1983).  The hourly rates used must be "in line with those prevailing in the community for services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 (1984).  This calculated lodestar is presumptively reasonable. *Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006).

Once this "raw" lodestar figure has been determined, the court may take into consideration additional factors to enhance the lodestar, including: the time and labor required; the novelty and difficulty of the questions involved; the skill requisite to perform the legal service properly; whether the fee is fixed or contingent; the preclusion of other employment by the attorney due to acceptance of the case; the amount involved and the results obtained; the experience, reputation, and ability of the attorneys; and awards in similar cases. *See Id*,  (citing *Cunningham v. County of Los Angeles,* 879 F.2d 481, 252 n.4 (9th Cir. 1988) and *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).  Moreover, these *Kerr* factors may further demonstrate the reasonableness of the fee request.

1    Plaintiffs submit the Declaration of Geoffrey Miller [DE ___], a professor of law at NYU

2  a recognized expert on the subject of attorney fee awards in class action lawsuits,[10] in further

3  support of this request for attorney fees, expenses and incentive awards.  In assessing whether

4  the requested fee is reasonable, Plaintiffs' Counsel urge the Court to give significant weight to

5  the opinion of Prof. Miller who is regarded as a preeminent expert on this subject and is

6  frequently consulted in class action cases.   Prof. Miller's declaration evidences the

7  reasonableness of the number of hours expended, the reasonableness of Class Counsel's hourly

8  rates and the reasonableness, overall, of the fee request in light of the applicable factors under

9  *Kerr*.  In addition, Prof. Miller further demonstrates the reasonableness of the fee request through

10  a statistical analysis which demonstrates that the requested fee is well in-line with fee awards in

11  class action cases in this district and nationwide.

12            **1.   Plaintiffs' Counsel's Hourly Rates are Reasonable**

13            The hourly rates that Plaintiffs Counsel seeks for their counsel are reasonable.  In

14  assessing the reasonableness of an attorney's hourly rate, courts should consider the prevailing

15  market rate in the community for similar services by lawyers of reasonably comparable skill,

16  experience, and reputation.  *Blum v. Stenson*, 465 U.S. 886, 895-96 & n.11 (1984).  Courts look

17  to the forum in which the District is located to determine the hourly rates that should apply.

18  *Camacho v. Bridgeport Financial, Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) ("[a]ffidavits of the

19  plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community, and rate

20  determinations in other cases[, particularly those setting a rate for the plaintiff's' attorney,] are

21  satisfactory evidence of the prevailing market rate" (quoting *United Steelworkers of Am. v.

22  Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990)).  The attorneys' actual billing rate for

23  comparable work is considered to be the presumptive market rate.[11]

24  ---
[10] *Miller Decl.*, *supra*, ¶¶ 2-8.

25  [11] Concerning hourly rates, Judge Posner has recognized "it is a fact of the market that an
attorney who is paid only when his client prevails will tend to charge a higher fee than one who
26  is paid regardless of outcome, and relevant professional standards long have recognized that this
practice is reasonable." City of Burlington v. Dague, 505 U.S. 557, 567 (1992) citing Posner,
27  Economic Analysis of Law, Section 21.9, pp. 534-535 (3d Ed. 1986).  Judge Posner has also
stated, "A contingent fee must be higher than the fee for the same legal services as they are
28  performed.  The contingent fee compensates the lawyer not only for the legal services he renders,

Class Counsel have filed accurate records which reflect all time expended in the investigation, litigation and settlement of this matter. *Lehrman Decl.*, Ex. B; *Grover Decl.*, Ex. A; *Knopf Decl.,* Ex. A; and *Brown Decl.*, Ex. A.  The total lodestar of each Plaintiffs' Counsel is set forth in their respective declarations. *Id.*  Plaintiffs Counsel's collective lodestar to date is $1,528,099 for 3,762.50 total hours worked on the Settlement from the inception of the Litigation to February 14, 2011. *Lehrman Decl.,* ¶ 7; *Grover Decl.* ¶ 10; *Knopf Decl.* ¶ 9; *Friedman Decl.* ¶ 12 ; and *Brown Decl.* ¶ 12.  In this case, Plaintiffs' Counsel have extensive experience in the area of consumer class actions, other complex class actions, and FCRA litigation. *Lehrman Decl.,* ¶¶ 3 - 6 ; *Grover Decl.* ¶¶ 2-4 ; *Knopf Decl.* ¶ 4; *Friedman Decl.* ¶¶ 5 and 7; and *Brown Decl.* ¶ 5 and 7.

The rates charged by Plaintiffs' Counsel are also well within the range of rates charged by or awarded to consumer class action attorneys within the Northern District and by this honorable Court. *See Fulford v. Logitech*, 2010 WL 807448 (N.D. Cal.)(This honorable Court approved hourly rates of eight attorneys appointed as class counsel, as follows: $850; $650; $500; $450; $400; $350; $300; and $200).  Moreover, the two plaintiff attorneys with primary case responsibility in *Logitech* charged approved hourly rates of $500 and $450 respectively. *See Id.*, *3; *See Lehrman Decl.*, Ex. C.

### 2.   The Number of Hours Plaintiffs' Counsel Worked is Reasonable

The work Plaintiffs Counsel did was meaningful.  Since Class Counsel undertook substantial investigation, fact-gathering, and formal discovery (including review of thousands of pages of documents produced by Defendant as well as thousands of pages of consumer file disclosures. *Lehrman Decl.*, ¶ 10, *Brown Decl.*, ¶ 8, and *Friedman Decl.*, ¶ 8.  Plaintiffs' Counsel also engaged several consulting experts on credit reporting and the information technology involved in the furnishing of credit information, the creation and maintenance of consumer credit

---

but also for the loan of those services.  The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of a conventional loan." Posner, Economic Analysis of Law, 534, 567 (4th Ed. 1992).

files, and the creation of file disclosures, consumer reports and other credit products.  Moreover, the parties have engaged in motion practice related to discovery and Plaintiffs had fully briefed a motion for class certification before reaching the Settlement Agreement.  They have attended several status conferences and a hearing on preliminary settlement approval. *Lehrman Decl.*, ¶¶ 10.

   The time and labor required to litigate a case relates to the reasonableness of the hours claimed by prevailing counsel. *Blum v. Stenson*, 465 U.S. at 898 (1984).  As further detailed in the Declaration of Steven F. Grover, Esq., there are numerous "off-the-record" events which further explain the extensive labor that was involved in this class action and which thus justify the necessity and reasonableness of the time expended by Plaintiffs' counsel.  These events, include the following:

   a.  Equifax produced over 3,000 pages of documents. *Grover Decl.*, ¶ 7.a. Much of it was so technical— involving numerous computer codes and systems—that the documents needed to be scrutinized by Plaintiff's counsel. *Id.*  Frequent consultations had to be made with experts on information technology and credit bureau practices. *Id.*  Approximately 2,700 additional pages of redacted dispute letters to Equifax needed to be carefully studied. *Id.,* ¶ 7.c.   Doing so was critical because Equifax had claimed that it was not on notice of the alleged violation in consumer file disclosures. *Id.*  Accomplishing this large project required careful reading of approximately 900 dispute letters, to zero in on those that stated a dispute matter that was clearly on point. *Id.*  Prior to this undertaking, attorneys Robert Friedman and Joel Brown-- who are experts in the FCRA by virtue of the many cases they have handled on behalf of consumers--culled these 900 dispute letters from over 15,000 dispute letters they had sent to credit bureaus. *Id.*

   b.  The amount of time devoted to phone calls, e-mails, conferences, mediations and strategy sessions, to achieve the settlement, was colossal. *Id*., ¶ 7.d.  Equifax did not lightly or easily offer anything of value to the Class, and was resistant to the change of procedures. *Id*.  Virtually every detail was an issue, because this case involves one of Equifax's

core business practices that affects approximately 200 million Americans (i.e., almost all adult Americans with credit files). *Id.*  Consequently, the amount of time needed was huge. *Id.*, ¶ 7.e.

c.    Equifax resisted formal agreement to any change of procedures until late 2010—over three years into the case.  Plaintiff's counsel doggedly insisted on a meaningful change of procedures when some attorneys would have given up and been satisfied that they had succeeded in recovering a service for 60,000 Class members, worth $9,324,000. *Id.*  That success still would have left the problem unresolved for virtually all Americans who request a copy of their credit reports. *Id.*  It was not until the status conference before this Court that Equifax's counsel officially acknowledged a change of procedures, and not until November 2010 that the change of procedures was reduced to writing, after further intensive negotiations. *Id.*

d.    The negotiations over the recovery for the 60,000 class members were intensive and time-consuming. *Id.*, ¶ 7.e.  Equifax started out by offering *nothing* to anyone other than the class representatives. *Id.*  While this stance was promptly rejected by Plaintiffs' counsel, it took a lot of time—and intervening work, of course—until Equifax even got to the point of offering three months of Credit Watch Gold to 5,000 class members. *Id.*  It then took a tremendous amount of negotiations to obtain Equifax's agreement to provide twelve months of Credit Watch Gold to 60,000 consumers. *Id.*  Equifax was very reluctant to offer a free service to Class members. *Id.*

e.    At the outset of discovery, Equifax took the position that it could not ascertain the number of consumers who fit within the class definition because their databases and search capacities, although advanced, simply did not allow it. *Id.*, ¶ 7.g.  Plaintiffs' counsel needed to consult heavily with its experts, and study Equifax's technology capacities, to convince Equifax that it could ascertain the number and identities of class members. *Id.*, ¶ 7.g.  Eventually Equifax revealed that it could accomplish the task. *Id.*

f.    Throughout this case, a great deal of study of the class action case of *White et al v. Experian*, et al, 8:05-cv-01070-DOC-MLG (C.D. Cal.), had to be undertaken—as well as extensive consultations and negotiations with counsel for White and counsel for Equifax,

respectively—because of potential overlap with that case and concern that the release in that case could be binding. *Id*., ¶ 7.h.  In order to preserve the rights of Mrs. Villaflor and the Class, a "carve-out", with multiple amendments of the class definition to exclude certain consumers with Chapter 7 discharges, needed to be made. *Id*.  This was a very complex and time-consuming part of this case. *Id*.

g.       Class counsel extensively studied the records of several class actions and individuals actions against Equifax under the FCRA in order to buttress this case. *Id*., ¶ 7.i. Hundreds of filings were scrutinized. *Id*.  Several key pieces of evidence were found that potentially helped make Equifax aware that Plaintiffs were not "just whistling Dixie" with their claims that the FCRA violation was "willful" (i.e., in reckless disregard of FCRA obligations)— a necessary element for winning the case. *Id*.

h.       The number of record entries in the case at bar do not fully reflect the amount of work that was done. *Id*., ¶ 7.j.  For example, Steven F. Grover, esq. worked on the Motion to Certify for months, but it was not filed because this case was settled in principle very shortly before it was due. *Id*.

i.       Plaintiffs' counsel and defense counsel wrangled over approximately 220 written discovery requests in this case.  Almost none of that extensive work is reflected in the record because the parties agreed on at least two occasions to suspend the filing of certain motions to compel, and instead to focus on continuing settlement negotiations.

Counsel participated in two days of mediation, a one day in-person settlement conference, and many hours of settlement conference conducted by telephone. *Lehrman Decl.*,¶ 10, 26-28 and 32; and *Grover Decl.,  ¶* 7.k.  Not only were the hours that Plaintiffs Counsel put into this case reasonable, but Class Counsel have served the public good by achieving injunctive relief that will change the way Defendant reports status information to consumers on file disclosures, thus delivering a benefit beyond the Settlement Class to the millions of consumers who receive their file disclosure from Equifax annually. *Lehrman Decl., ¶* 33.  Thus, Plaintiffs' Counsel respectfully submit that this Court may and should find that all of the hours Counsel

spent in this action were reasonably incurred.  The Settlement Agreement provides that Counsel

may seek an award for $1,380,000 in attorneys' fees and costs

### C.  The *Kerr* Factors Further Demonstrate the Reasonableness of the Requested Fee

Although several of the *Kerr* factors have been subsumed into the calculation of lodestar,

these subsumed *Kerr* factors remain relevant to demonstrating the <u>reasonableness</u> of the lodestar

calculated fee.  Application of the pertinent *Kerr* factors to Plaintiffs' lodestar calculated fee

further demonstrates the reasonableness of Plaintiffs' request as discussed below. *See Hanlon*,

150 F.3d at 1029 and *Kerr*, 526 F.2d at 70.

### 1.  Plaintiffs' Counsel Have Achieved Significant Relief for the Class

Attorneys' fees and expenses may be recovered "in the case of any successful

action to enforce any liability under" the FCRA. 15 U.S.C. §§ 1681n (a) (3), 1681o(a)(3).  Courts

applying this provision have relied on the two part test established by the Supreme Court in

*Buckhannon* to determine whether a party is entitled to fees as a "prevailing" party. *See Nagle v.*

*Experian Info. Solutions, Inc.*, 297 F.3d 1305, 1307 (11th Cir. 2002); *Crabill v. Trans Union,*

*L.L.C.*, 259 F.3d 662, 666-67 (7th Cir. 2001). Under this standard, a plaintiff may recover fees

where: (1) she achieves a material alteration of the legal relationship between the parties that

benefits her; and (2) such alteration is "judicially sanctioned." *Buckhannon Bd. & Care Home*

*Inc. v. West Virginia Dept. of Health & Human Res.*, 532 U.S. 598, 604-05 (2001); *Nagle*, 297

F.3d at 1307.

The Ninth Circuit has repeatedly found plaintiffs to be entitled to fees under

*Buckhannon* where, as here, the parties enter into a judicially-enforceable settlement agreement.

*See, e.g., Richard S. v. Dept. of Developmental Servs.*, 317 F.3d 1080, 1087 (9th Cir. 2003)

(noting the judicial imprimatur on a settlement that "materially altered the legal relationship

between the parties, because the defendants were required to do something directly benefiting the

plaintiffs that they would not otherwise have had to do"); *Barrios v. Cal. Interscholastic Fed'n*,

277 F.3d 1128, 1134 (9th Cir. 2002); *Labotest, Inc. v. Bonta*, 297 F.3d 892, 895 (9th Cir. 2002);

*Fischer*, 214 F.3d at 1118 (finding it "clear" in a case without any monetary relief that plaintiff

1 was a "prevailing party" under *Buckhannon*, since he obtained "an enforceable settlement that

2 requires the [defendant] to do something it otherwise would not be required to do").

3          Like the plaintiffs in *Richard S.* and *Fischer*, Plaintiffs here qualify as

4 "prevailing" or "successful" under *Buckhannon* as a result of the settlement agreement.  The first

5 prong of the *Buckhannon* test is easily satisfied since Plaintiffs have secured an injunction which

6 requires Defendant to take significant steps that it would not otherwise have been required to

7 take. *See Richard S.*, 317 F.3d at 1087.  Defendant will be required to make significant changes

8 to its procedures for preparing consumer file disclosures.  Thus, the "judicial imprimatur"

9 required by the second prong of the *Buckhannon* test is present as well.  Multiple courts have

10 found plaintiffs to be "prevailing," and thus entitled to fees, where they were successful in

11 obtaining injunctive relief, but tried and failed to recover money damages. *See id.*; *Levine v. City*

12 *of Alameda*, 2006 WL 1867532, * 2-3 (N.D. Cal. 2006) ; *See also, Fischer v. SJB-P.D. Inc.*, 214

13 F.3d 1115, 1118 (9th Cir. 2000)(holding that equitable relief in a settlement agreement requiring

14 defendant "to 1) print an expanded nondiscrimination policy, 2) insert it into its company

15 manual, and 3) post it conspicuously throughout its business" established plaintiff as a prevailing

16 party because defendant was compelled to take action it would not have taken otherwise).

17 Moreover, as noted above, while the beneficiaries of the Settlement will include many members

18 of the proposed Settlement Class and the greatest benefit of the injunctive relief provided by the

19 Settlement may be to the as-yet unknown millions of consumers who will receive file disclosures

20 from Equifax.

21          "[I]t is inappropriate for a district court to reduce a fee award below the lodestar

22 simply because the damages are small." *Quesada v. Thomson*, 850 F.2d 537, 540 (9th Cir. 1988).

23 The in-kind prospective settlement benefits secured by Plaintiffs through the Settlement – twelve

24 months of credit monitoring service - are appropriately tailored to the facts and FCRA violations

25 alleged by Plaintiffs with respect to Defendant's file disclosures.

26

27

28

1

2
**2.  Fee Awards in Similar Cases Are Consistent with the Award Agreed**
    **Upon by the Parties in this Action**

3

Several recent FCRA class action settlements have produced similar relief for

4
consumers, including comparable fee awards for plaintiffs' counsel.  In *Pike/White/Hernandez*,

5
an injunctive relief class settlement[12] was reached which did not produce any monetary relief or

6
in-kind benefit.[13]  The parties agreed to a lodestar based fee of $4,000,000 which was approved

7
by the court.  In *Gillespie v. Equifax*, a class settlement was reached and approved by the court

8
which provided the following settlement benefits: (a) six months of Equifax Credit Watch Gold

9
to a settlement class of approximately 60,000 consumers; (b) significant changes to pertinent

10
parts of Equifax's consumer file disclosure format to remedy the alleged violations which

11
benefited class members and millions of other consumers who receive their file disclosures from

12
Equifax each year; and (c) the expenses associated with providing notice and settlement

13
administration borne by Equifax.  The preliminarily approved settlement in the instant action is

14
similar to that in *Gillespie* with the significant exception that Plaintiffs' Counsel have secured

15
<u>twelve months</u> (12) of access to the credit monitoring product, twice the length of this significant

16
in-kind benefit and thus twice the value of the remedy obtained in Gillespie.  In *Gillespie* the

17
parties agreed to attorney fees of $932,000 based on lodestar.  In *White v. E-Loan*, the court

18
approved a lodestar based fee request of $750,000 in connection with approving a class action

19
settlement of FCRA claims.   The settlement provided class members with one Equifax file

20
disclosure, a free credit score and $20.
    **3.  Plaintiffs' Counsel Bore Significant Risk Due to the Contingent Nature of**
        **the Fee**

21

22

23
Plaintiffs' Counsel's willingness to bear the significant risk associated with taking

24
[12] A monetary relief settlement was also reached under which plaintiffs' counsel is entitled to
receive additional fees. *See Lehrman Decl.*, Ex. E-1.

25
[13] This settlement required Equifax and other credit reporting agencies, to change the manner of
reporting debts discharged in chapter seven bankruptcy on consumer file disclosures to clearly

26
and accurately reflect that such debts were discharged and were not still owing.  The district
court found that this purely injunctive relief settlement delivered significant value to the

27
settlement class and to millions of consumers who, although not members of the class would
nonetheless derive substantial benefits from this change of procedures.

28

1   on a case with no guarantee on a contingent fee basis further demonstrates the reasonableness of

2   Plaintiffs' lodestar based fee request. *Fulford v. Logitech*, 2010 WL 807448 (N.D.Cal.), *4 (This

3   Court found that the fact that plaintiff's counsel "expended considerable time and expense" on a

4   "purely contingent basis, with no assurance of recovering expenses or attorneys' fees" justified

5   the lodestar fee request as well as a multiplier of 1.66.).   As in *Logitech*, for more than three

6   years, Plaintiffs' Counsel have assumed and borne significant risk by pursuing this case on a

7   purely contingent basis. [14]   Plaintiffs' Counsel advanced significant expenses, thereby placing

8   their own financial resources at risk, with no guarantee of recovery. *Lehrman Decl.*, ¶ ; *Grover*

9   *Decl.*, ¶ 6.a.  Equifax has never conceded liability, the appropriateness of class certification, or

10  the availability of damages.   There was no guarantee of success, yet Plaintiffs' Counsel

11  accomplished a significant Settlement in which Equifax will provide immediate and substantive

12  relief for the Class Members.

13          The risks of the case at bar—as well as the opportunity costs—have been steep.

14  For example, co-lead counsel Steven F. Grover, a sole practitioner who worked the most hours

15  on the case, earned much less than his normal income during the case.  This was especially so in

16  2010, the busiest year in this case, in which he earned under $65,000.  In addition, he loaned

17  large amounts of personal funds to his law office to keep it running while working on this case.

18  During the three-plus years of this case, he normally had to wait over six months to bring any

19  money home, because of the serious cash-flow problems that this case created.  Because of this

20  class action, from 2008 to the present, Mr. Grover turned down handling over 30 cases that

21  otherwise would have been pursued and would have generated significant income.  Approval of

22  the fee request in this case would compensate Plaintiffs' counsel, including Mr. Grover, for over

23  three years of hard work and delayed income.

24          When the parties settled this case and agreed upon the amount of attorneys' fees,

25

26

27  _____

[14] In *Gillespie*, plaintiffs challenged Equifax's consumer file disclosures on the alleged basis that they failed to clearly and accurately disclose the date of last delinquency for accounts, a date that is significant in determining how long an account may be reported under the FCRA.

28

Equifax understandably insisted on capping the amount of fees and expenses to a specific number.  There is great risk undertaken by Plaintiffs' counsel in doing so in a class action.  A lot of follow-through work is needed.  There is also a risk of objectors and major delays in resolving the case.  This fact is illustrated by the ongoing case of *White et al v. Experian, et al*, 8:05-cv-01070-DOC-MLG (C.D. Cal.), a FCRA class action in which the parties settled the case roughly two years ago, but prolonged complications with objectors ensued that have delayed resolution of the case.

Of course, there was also far from any guarantee of success in this case.  Equifax had a good-faith argument that there was no violation of the FCRA at all, and that even if there was one, that it was not grounds for the award of statutory damages because it was not "willful", i.e., in reckless disregard of its FCRA obligations.  Had Equifax persuaded a jury that its acts were merely negligent, Plaintiffs would have been "zeroed".  Further, Equifax had several good-faith arguments that class certification was not proper—including that Plaintiffs' claims were not typical of the class, and that the suit was not proper for class treatment because Class members had not suffered any damages.

### D.     A Percentage of Common Fund Cross-Check Further Supports the Reasonableness of the Fee Request

In the Ninth Circuit, the benchmark for reasonableness under the percentage of common fund method is 25%. *Vizcaino*, 290 F.3d 1043, 1047 (9th Cir. 1990); *Hanlon*, 150 F.3d at 1029; *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d at 272.  In *Hanlon*, the Ninth Circuit further recognized that percentage fees in the range of 20-30% are generally appropriate. *Hanlon*, 150 F.3d at 1029, *Miller Decl.*, ¶ 33.

The common fund in this case consists of the credit monitoring product available to the Class, attorney fees and expenses, and the costs of notice and settlement administration which Equifax has agreed to pay.  The credit monitoring product which Equifax has agreed to provide

to Settlement Class Members has a retail value of $155.40[15] per Class Member. *Miller Decl.*, ¶ 28.  Therefore, the aggregate retail value of this benefit for the approximately 60,000 Class Members is $9,324,000.  In addition, Equifax has agreed to pay Plaintiffs' Counsel fees and expenses in the total amount of $1,380,000, of which $80,000 are expenses and $1,300,000 are fees.  Costs of notice and settlement administration are estimated at $100,000.  Incentive awards to the two named plaintiffs are $10,000 each.  Therefore the total common fund under this settlement is estimated at $10,824,000.

In this case, Plaintiffs request $1,300,000 in attorneys' fees.  This request is 12% of the estimated common fund which is well in line with the Ninth Circuit benchmark, for three years of extensive litigation producing significant benefits to the Settlement Class.  Moreover, the proposed 12% fee is also reasonable when compared to percentage fees awarded in class action cases in California and across the country. *See Miller Decl*, ¶ 30**.**  Thus, the percentage of common fund analysis further demonstrates the reasonableness of Plaintiffs' fee request.

## IV.   <u>A Service Award To The Named Plaintiffs Is Appropriate</u>

In *Staton v. Boeing*, the Ninth Circuit recognized that "named plaintiffs . . . are eligible for reasonable incentive payments." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). Under *Staton*, such awards should be evaluated using "'relevant factors, includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s] of workplace retaliation.'" *Staton*, 327 F.3d at 977 (citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)) (ellipses in original).

The Settlement Agreement provides for $10,000 incentive awards for the Class Representatives in recognition of their service to and efforts on behalf of the Class. *See* Settlement Agreement § 5.2 (DE 131-1).  These incentive awards are in addition to the relief the

---

[15] See Declaration of Seth Lehrman in Support of Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement [DE 131], Ex. C [DE 131-3].

class representatives will be entitled to under the terms of the Settlement.   Throughout the litigation, Obelia Villaflor and Kay Brice participated in discovery, including lengthy depositions, responding to interrogatories and requests for production of documents, and communicating with counsel to facilitate the preparation of pleadings.   They were kept informed of the litigation as it developed and were kept abreast of, and approved the Settlement.

Incentive awards like the ones requested here are appropriate.   Unlike unnamed Class members, who will enjoy the benefits of the Representatives' efforts without taking any personal action, the named Class Representatives made themselves available as witnesses at deposition and subjected themselves to all the obligations of named parties, including participating in discovery and following the litigation.   Small incentive awards promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits. *See*, *e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000); *Staton*, 327 F.3d at 977; *Stevens v. Safeway, Inc.*, 2008 U.S. Dist. LEXIS 17119 (C.D. Cal. 2008); *see also* Manual for Complex Litig., § 21.62 n.971 (4th ed. 2004) (incentive awards may be "merited for time spent meeting with class members, monitoring cases, or responding to discovery").

The class representatives participated actively in the litigation. *Lehrman Decl.,* 33.   Such incentive payments are therefore appropriate here. *Staton*, 327 F.3d at 977; *In re Mego Fin. Corp. Securities Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).

In *Logitech*, this Court cited incentive awards paid in the Ninth Circuit and other Circuits and noted that incentive awards of $10,000, the amount requested here, are at the modest end of the spectrum.[16]   In light of Plaintiffs' considerable effort and risk undertaken to obtain the

---

[16] Logitech, *3, FN1 (stating that *See*, *e.g.*, *Hughes v. Microsoft Corp.*, F. Supp. 2d, 2001 WL 34089697, 2001 U.S. Dist. LEXIS 5976, at *36-38 (approving incentive awards of $7,500, $25,000, and $40,000); *Carroll v. Blue Cross & Blue Shield of Mass.*, 157 F.R.D. 142, 143 (D. Mass. 1994), *aff'd* 34 F.3d 1065 (1st Cir. 1994) ("the class representatives shall receive payments of $7,500 each as compensation for services rendered to the class in initiating and prosecuting this action"); *Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27, 32 (E.D. Pa. 1985) (stating "the propriety of allowing modest compensation to class representatives seems obvious," and awarding $25,000 to two named class representatives). *See also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 457, 463 (approving service awards of $5,000 from a total settlement of $1,725,000); *Razilov v. Nationwide Mut. Ins. Co.*, No. 01-CV-1466-BR., 2006 WL 3312024, *3-*4 (D. Or. Nov. 13, 2006) (approving $10,000 award to each class representative)).

outstanding result for the Class, Plaintiffs' Counsel request that the Court approve the payments of $10,000 to each of the named Plaintiffs.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs Counsel respectfully request that this Court grant their Motion for an Order Granting their Application for Attorneys' Fees and Expenses in the negotiated amount totaling $1,380,000 plus incentive awards of $10,000 each to Obelia D. Villaflor and Kay B. Brice respectively for the services they have rendered to the Class.

Dated:  February 14, 2011                     Respectfully submitted,

/s/ Seth Lehrman
Seth Lehrman [CSBN 178303]
Farmer, Jaffe, Weissing, Edwards,
Fistos & Lehrman, P.L.
425 North Andrews Ave., Suite 2
Fort Lauderdale, FL 3330
Tel.: 954-524-2820
Fax: 954-524-2822
E-mail: seth@pathtojustice.com

s/ Steven F. Grover
Steven F. Grover [Pro Hac Vice]
Fla. Bar No. 131296
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel.: 954-356-0005
Fax: 954-356-0010
E-mail: lawhelp@earthlink.net

Robert Friedman [Pro Hac Vice]
Fla. Bar No. 0056545
E-mail: robertf@fclawgroup.com
Joel Adrian Brown [Pro Hac Vice]
Fla. Bar No. 0066575
Friedman & Brown, LLC
3330 N.W. 53 St., Suite 306
Fort Lauderdale, FL 33309
Tel.: 954-334-7670
Fax: 954-334-7668
E-mail: joelb@fclawgroup.com

James S. Knopf [CSBN 178934]

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices of James S. Knopf
536 El Camino Real
Redwood City, CA 94063
Tel.: 650-627-9500
Fax: 888-808-5001
E-mail: jsk@knopflaw.com

Attorneys for Plaintiffs and the
Proposed Settlement Class