SETH LEHRMAN (CSBN 178303)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Suite 2
Fort Lauderdale, Florida 33301
Tel  954-524-2820
Fax 954-524-2822
Email:  seth@pathtojustice.com

Along with other Plaintiffs' counsel

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Obelia D. Villaflor and Kay A. Brice, individually and on behalf of all similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>Equifax Information Services, LLC,<br><br>Defendant. | Case No.: 3:09-cv-00329-MMC<br><br>Judge: Hon. Maxine M. Chesney |

## DECLARATION OF PROFESSOR GEOFFREY P. MILLER

1.  I am the Stuyvesant P. Comfort Professor of Law at New York University located in New York, New York.  I have been retained to provide an expert opinion as to the appropriate award of attorneys' fees and expenses in the above-captioned matter.  In that capacity, I make the following representations on the basis of my own personal knowledge.  If called as a witness, I could and would competently testify to the matters stated herein.

### Background and Qualifications

2.  For more than twenty years I have been involved in the area of class action litigation as a teacher, scholar, attorney, consultant, American Law Institute advisor, and expert witness.

1

3.  I teach classes covering class action litigation, including Civil Procedure, Complex Litigation, Corporations, and Professional Responsibility, as well as continuing legal education seminars.

4.  I have acted as counsel in both class action and shareholders derivative cases.

5.  I have written more than a dozen research articles dealing with class action law and practice.  My articles on class actions have been cited by state and federal courts across the United States.

6.  One of my major areas of research has been the subject of class action attorneys' fees. With Professor Theodore Eisenberg of Cornell University, I am the author of leading empirical analyses of attorneys' fees in class action cases: *Attorneys Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27 (2004), and *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248 (2010).  These articles are frequently cited as authority for the determination of reasonable fees in class action cases.[1]

---

[1]  In re Trans Union Corp. Privacy Litigation, --- F.3d ----, 2011 WL 117108 (7th Cir. 2011) (Posner, J., relying on Eisenberg-Miller study); Allapattah Services, Inc. v. Exxon Corp., 362 F.3d 739 (11th Cir. 2004); Kay Co. v. Equitable Production Co., --- F.Supp.2d ----, 2010 WL 4501572 (S.D.W.Va. 2010); Velez v. Novartis Pharmaceuticals Corp., 2010 WL 4877852 (S.D.N.Y. 2010); In re Vioxx Products Liability Litigation, --- F.Supp.2d ---- (E.D.La. 2010); In re Lawnmower Engine Horsepower Marketing & Sales Practices Litigation, --- F.Supp.2d ----, 2010 WL 3310264 (E.D.Wis. 2010) (characterizing the Eisenberg-Miller study as "the best indicator of what the market would pay class counsel for their services"); Klein v. O'Neal, Inc., 705 F.Supp.2d 632 (N.D.Tex. 2010); In re Marsh Erisa Litigation, 265 F.R.D. 128 (S.D.N.Y. 2010); In re MetLife Demutualization Litigation, 689 F.Supp.2d 297 (E.D.N.Y. 2010); Braud v. Transport Service Co. of Illinois, 2010 WL 3283398 (E.D.La. 2010); In re Trans Union Corp. Privacy Litigation, 2009 WL 4799954 (N.D.Ill. 2009); Hall v. Children's Place Retail Stores, Inc., 669 F.Supp.2d 399 (S.D.N.Y. 2009); Loudermilk Services, Inc. v. Marathon Petroleum Co. LLC, 623 F.Supp.2d 713 (S.D.W.Va. 2009); In re OCA, Inc. Securities and Derivative Litigation, 2009 WL 512081 (E.D.La. 2009);  In re Cardinal Health Inc. Securities Litigations, 528 F.Supp.2d 752 (S.D.Ohio 2007); Turner v. Murphy Oil USA, Inc., 472 F.Supp.2d 830 (E.D.La. 2007) ("the Court will look to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude");  In re Cabletron Sys. Inc. Securities Litigation, 239 F.R.D. 30 (D.N.H. 2006); In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litigation, 447 F.Supp.2d 612 (E.D.La. 2006); In re Chiron Corp. Securities Litigation, 2007 WL 4249902 (N.D.Cal. 2007); In re Lupron Marketing and Sales Practices Litigation, 2005 WL 2006833 (D.Mass. 2005).

2

7.  I have consulted with attorneys to assist with issues pertaining to class certification, class settlement, and awards of class counsel fees.  I have been qualified as an expert and testified in class action cases in state and federal courts across the United States, including testimony on the topic of the appropriate award of attorneys' fees.

8.  Further information on my background and qualifications is set forth my resume, attached hereto as Appendix B.

### Materials Relied On

9.  In preparing this opinion, I have discussed this case with counsel, examined relevant research papers, and reviewed pleadings and other documents including but not limited to those listed in Appendix A of this Declaration.

### Summary of Opinion

10.  The requested award for attorneys' fees and expenses in the amount of $1,380,000 is reasonable when evaluated in light of awards in similar cases.

### The Litigation

11.  This is an action for violations of the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq., as amended ("FCRA").  Defendant Equifax is a major national credit reporting agency. The complaint alleged that Defendant, in violation of FCRA, reported that accounts which had been "paid" and "closed" had a "current status" of thirty to one-hundred-and-twenty days "Past Due".

12.  The action was originally filed in the Central District of California but was transferred to the Northern District of California by mutual consent.

13.  During the course of discovery Defendant attempted to take a 30(b)(6) deposition of FB Legal, a firm which provides credit correction services.  Plaintiffs sought a protective order

3

on the ground that the information sought was only marginally relevant and that the proposed deposition threatened to intrude on the attorney-client privilege. Magistrate Judge Elizabeth LaPorte granted the motion for a protective order on July 21, 2010.

14. This litigation was hard-fought and adversarial, extending over three years and including discovery by both sides, motion practice, the retention of experts, and multiple settlement conferences, including two with The Honorable Philip Etheridge, a retired judge for the Superior Court of Fulton County, Georgia.

15. The parties eventually negotiated a settlement of the dispute (described below). Judge Chesney preliminarily approved the settlement and conditionally certified a settlement class on December 30, 2010.

The Settlement

16. The Settlement Agreement establishes revisions to Equifax's file disclosure format and its website to correct the problems of inaccurate or confusing credit reporting identified in the complaint. The benefits of the settlement extend, not only to members of the settlement class, but to millions of other people who request their file disclosure from Equifax on an annual basis.

17. For class members whose file disclosures allegedly did not clearly and accurately disclose the status of paid-and-closed accounts, the settlement agreement provides relief in the form of an automatic, no-cost right to use Equifax's "Credit Watch Gold" product for twelve months.

18. In addition, Defendant agrees to pay other items which otherwise could be the responsibility of the class, including (a) the costs of notice and settlement administration; (b) class counsel's attorneys' fees and expenses in the aggregate amount of $1,380,000; and (c) incentive awards of $10,000 to each of the class representatives.

19. As shown by the following table, the settlement compares favorably with settlements in similar cases:

Table 1:  Settlements in Similar Cases

| Case/ District/ Case # | Settlement Class | In-Kind Relief | Attorney Fees & Expense Request |
|---|---|---|---|
| *In re: The Progressive Insurance Corp. Underwriting and Rating Practices Litigation* ND FL 03-cv-01519 MMP | 10,000,000 | 1 free Experian credit score ($5.95 retail price) | $3,000,000 |
| *Villaflor and Brice v. Equifax* ND Cal. 09-cv-00329-MMC | 60,000 | 12 months Equifax Credit Watch Gold | $1,380,000 |
| *Chakejian v. Equifax*[2] ED PA 07-cv-02211-AB | 42,000 | 18 months Equifax Credit Watch Gold | $1,075,000 |
| *Gillespie v. Equifax* ND IL 05-c-0138-MFK | 40,000 | 6 months Equifax Credit Watch Gold | $932,000 |
| *White v. E-loan* ND CA 05-cv-02080-SI | 200,000 | 1 free Equifax credit report and 1 free credit score ($15.95 total retail price); and $20.00 check | $750,000 |

The Fee Request

20. Courts award fees in class action cases for two purposes: to reward counsel for their services and to ensure that attorneys have adequate incentives to litigate cases which might not otherwise be brought.  The present litigation illustrates both rationales.  Working entirely on a contingency basis, plaintiffs' attorneys achieved meaningful relief for class members, and also generated a benefit for many millions of others who are not members of the class.  Neither these

---

[2] The proposed class action settlement in *Chakejian v. Equifax* has been preliminarily approved.

5

nor any other attorneys would have filed this case if they did not expect to receive adequate compensation for their time, expense and risk.

Lodestar Method

21. I first evaluate the reasonableness of the fee request using the lodestar calculation. This method calculates counsel's "lodestar" fee by multiplying reasonable hours worked by reasonable hourly rates, and then adjusts this product by a "multiplier" to take account of case-specific factors, especially the risk of the litigation. Although the lodestar method is not favored in a majority of jurisdictions in the United States, it can be a useful way to determine a fee when the value of the recovery obtained on behalf of the class is difficult to estimate.

22. Counsel reports the following hours and hourly rates:

| Attorney/Paralegal | Rate | Hours | Total |
|---|---|---|---|
| Seth Lehrman | $450 | 1110.3 | $499,635 |
| Steven F. Grover | $450 | 1535.1 | $690,795 |
| James S. Knopf | $400 | 220.4 | $88,160 |
| Robert A. Friedman | $350 | 260.5 | $91,175 |
| Joel A. Brown | $350 | 383.9 | $134,365 |
| Paralegals | $95 | 252.3 | $23,969 |
| | Total | 3762.5 | $1,528,099 |

Based on the reported lodestar of $1,528,099, the fee request of $1,307,681.30 amounts to a fractional multiplier of .86.

23. I have not attempted to audit counsel's hours or hourly rates in connection with this assignment. However, I have considerable background and expertise in attorney compensation and can say without hesitation that the attorney hourly rates being requested here, ranging from $350 to $450, are well within the range of reason and in fact below the rates often charged in class action cases. As for the hours, some information on reasonableness can be obtained by comparison with other cases. As discussed below (¶ 29), the face value of the recovery in this case can be estimated at slightly more than ten million dollars. A survey of more than 1,000

class action cases conducted in 2003 found that for cases with face value recoveries in this range reported an average of 4,437 hours.  The 3,666 hours reported by counsel in this case appears reasonable by comparison:

Table 2: Attorney Hours by Recovery Range, CAR Data

| Recovery Range ($ millions) | No. of Cases | Average Hours |
|---|---|---|
| > $100 | 64 | 30,326 |
| $75 < $100 | 26 | 17,336 |
| $50 < $75 | 37 | 18,714 |
| $30 < $50 | 67 | 7,395 |
| $20 < $30 | 65 | 5,435 |
| $10 < $20 | 153 | 4,437 |
| $5 < $10 | 217 | 2,622 |
| $3 < $5 | 142 | 1,933 |
| $2 < $3 | 98 | 841 |
| $1 < $2 | 123 | 826 |
| < $1 | 128 | 745 |
| All Cases | 1,120 | 5,142 |

Source: derived from Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep. 169 (2003).

24. I turn to a consideration of the reasonableness of the requested multiplier of .86.  A study of more than one thousand class action settlements, published in the journal "Class Action Reports," found that the average multiplier in cases in the $10-$20 million settlement range was 1.97:

Table 3: Lodestar Multipliers by Recovery Range, CAR Data

| Recovery Range ($ millions) | No. of Cases | Multiplier |
|---|---|---|
| > $100 | 64 | 4.50 |
| $75 < $100 | 26 | 3.93 |
| $50 < $75 | 37 | 2.75 |
| $30 < $50 | 67 | 2.32 |
| $20 < $30 | 65 | 1.90 |
| $10 < $20 | 153 | 1.97 |
| $5 < $10 | 217 | 1.89 |
| $3 < $5 | 142 | 1.89 |
| $2 < $3 | 98 | 1.63 |
| $1 < $2 | 123 | 1.25 |
| < $1 | 128 | 1.10 |
| All Cases | 1,120 | 3.89 |

Source: derived from Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 169 (2003).

The questioned multiplier of .86 is obviously reasonable by comparison.

25.  Additional information on lodestar multipliers broken down by case category is found in Eisenberg and Miller's 2010 comprehensive study of eighteen years of class action settlements.  The average multiplier in consumer cases was 1.82:

Table 4: Average Multipliers by Case Category

| | | |
|---|---|---|
| Antitrust | 2.24 | 38 |
| Civil Rights | 1.99 | 11 |
| Consumer | 1.82 | 60 |
| Corporate | 1.94 | 7 |
| Employment | 1.24 | 21 |
| ERISA | 1.58 | 29 |
| Securities | 1.75 | 177 |
| Tort | 1.83 | 11 |
| Other | 2.35 | 14 |
| Total | 1.81 | 368 |

Source: Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248-281 (2010).

Again, the requested multiplier of .86 is entirely reasonable by comparison.

Percentage of Recovery

26. As a "cross-check" on the reasonableness of the fee when evaluated under the lodestar approach, I now consider the reasonableness of the fee request using the "percentage of recovery" method.

27. Counsel estimates that the expenses in this case will amount to approximately $80,000.

28. The Credit Watch Gold product made available to class members under this settlement has a retail value of $155.40.  For an estimated 60,000 class members, the aggregate retail value of this benefit is $9,324,000.  In addition, the settlement provides that Defendant will pay class counsel fees and expenses in an amount up to $1,380,000 – items that would otherwise be the responsibility of the class.  Defendant also agrees to pay costs of notice and settlement administration, which I estimate at $100,000, and incentive awards to two named plaintiffs of $10,000 each.   The face value of relief made available under this settlement can therefore be estimated at $10,824,000.

29. This figure, while useful, must be used with caution because it both underestimates and overestimates certain aspects of settlement value.  It underestimates by assigning no value to Defendant's changes in disclosure practices, a commitment which will provide a benefit not only to members of the settlement class but also to millions of others who request file disclosures from Equifax.  It overestimates the Credit Watch Gold product because some class members will not value this product at its full retail cost.

30. Notwithstanding these caveats, the $10,824,000 face value is useful as a starting point for analysis.  Based on this figure, the requested fee of $1,307,681.30 represents 12% of the class benefit.

9

31.   A 12% fee is within the range of reason and in fact below the fee awarded in similar cases.

32.   Contingency fees in non-class cases range between 33.3% and 50% of the recovery, with the median fee being around 40%.  A fee request of 12%  of settlement value is clearliy reasonable when judged by this comparison.

33.   The Ninth Circuit has determined that 25% of the recovery is a "benchmark" award for class action cases, and has further rrecognized that percentage fees in the range of 20-30% are generally appropriate. *Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1029 (9th Cir. 1998).  A 12% fee is obviously reasonable when judged by this standard.

34.   A 12% fee is also reasonable when judged against percentage fees awarded in class action cases in California and around the United States.  A 1996 study by the National Economic Research Associates (NERA), an economic consulting firm, found that fee awards in settled securities class actions average around 30 percent of the recovery.  Table 5 shows average and median fee awards for settled securities cases where the settlements ranged from less than $1 million to more than $50 million:

Table 5: Fee Awards in Settled Securities Class Actions 1991-1996: NERA Data

| Settlement Range (millions) | Number of Settlements | Total Value of Settlements | Total Attorney Fees | Average Attorney Fees as a Percentage of Settlement | Median Attorney Fees as a Percentage of Settlement |
|---|---|---|---|---|---|
| $0.00-$0.99 | 37 | $24,696,750 | $7,617,600 | 30.38% | 30.00% |
| $1.00-$1.99 | 66 | $96,506,502 | $30,642,005 | 31.88% | 33.33% |
| $2.00-$9.99 | 245 | $1,184,141,901 | $381,149,262 | 32.11% | 33.33% |
| $10.00-$49.99 | 76 | $1,488,892,280 | $471,161,635 | 31.72% | 33.15% |
| $50+ | 9 | $571,650,000 | $179,920,000 | 31.48% | 30.00% |
| Total | 433 | $3,365,887,433 | $1,070,490,502 | 31.84% | 33.33% |

Source:  Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? Table 9 (1996).

As can be seen, average and median fees in the NERA study are consistently at or above the 30% level.

10

35. The 1996 NERA study also demonstrated that federal circuit fee awards are generally consistent with one another. As shown in Table 6, average awards fell within a narrow range, from a low of 30.73% in the Fifth Circuit to a high of 32.78% in the Fourth Circuit. The average percentage fee in the Ninth Circuit was 32.57%. A 12% fee is clearly reasonable when judged by this measure:

Table 6: Plaintiffs' Attorneys Fees by Federal Circuit: NERA Data

| Circuit | Number of Settle-ments | Settlements as a Percentage of Total | Total Value of Settlements | Total Attorney Fees | Average Attorney Fee as a Percentage of Settlement |
|---|---|---|---|---|---|
| | | (Percent) | ----------------(Dollars)--------------- | | (Percent) |
| D.C. | 2 | 0.46 | 6,750,000 | 2,200,000 | 31.67 |
| First | 26 | 6.00 | 82,633,902 | 25,677,884 | 30.99 |
| Second | 69 | 15.94 | 440,285,121 | 139,037,770 | 31.48 |
| Third | 58 | 13.39 | 423,292,596 | 132,738,442 | 32.00 |
| Fourth | 12 | 2.77 | 75,325,000 | 23,716,667 | 32.78 |
| Fifth | 26 | 6.00 | 262,720,500 | 81,420,017 | 30.73 |
| Sixth | 13 | 3.00 | 120,875,000 | 36,921,000 | 31.00 |
| Seventh | 18 | 4.16 | 149,933,784 | 48,375,833 | 31.83 |
| Eighth | 12 | 2.77 | 52,175,000 | 17,640,500 | 32.47 |
| Ninth | 155 | 35.80 | 1,379,894,030 | 450,725,681 | 32.57 |
| Tenth | 13 | 3.00 | 203,650,000 | 62,038,333 | 32.13 |
| Eleventh | 29 | 6.70 | 168,352,500 | 49,998,375 | 29.92 |
| Total | 433 | 100.00 | $3,365,887,433 | $1,070,490,502 | 31.84 |

Source: Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? Table 12b (1996).

36. Researchers affiliated with NERA updated the 1996 study in 1999. The 1999 NERA update shows that fee awards in securities class actions continue to average around 30 percent of the common fund recovery when expenses are excluded. Table 7 shows this in the bottom row:

<u>Table 7: Fee Awards in Settled Securities Class Actions 1991-1999: NERA Data</u>

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Jun-99 | 1991 to Jun-1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Settlements | 48 | 79 | 90 | 101 | 104 | 104 | 98 | 80 | 29 | 733 |
| Average Settlement (millions) | $6.3 | $9.9 | $8.3 | $6.1 | $10.7 | $7.0 | $7.9 | $11.0 | $6.0 | $8.3 |
| Total Value of Settlements (millions) | $304.8 | $778.5 | $749.1 | $615.9 | $1,108.7 | $722.9 | $769.8 | $876.3 | $174.2 | $6,100.2 |
| Median Settlement (millions | $3.7 | $5.0 | $4.4 | $3.6 | $4.8 | $4.1 | $3.2 | $5.8 | $4.3 | $4.2 |
| Average Plaintiffs' Attorney Fees (millions) | $2.1 | $2.7 | $2.0 | $2.0 | $3.5 | $2.2 | $2.5 | $3.4 | $2.0 | $2.5 |
| Average Plaintiffs' Attorney Fees as a Percentage of Average Settlement | 33% | 27% | 24% | 34% | 33% | 31% | 32% | 31% | 33% | 30% |

Source: Todd S. Foster, Denise N. Martin, Vinita M. Juneja, Frederick C. Dunbar, Trends in Securities Litigation and the Impact of PSLRA, Figure 12 (June 1999).

37.  The Federal Judicial Center has also examined the issue of class action attorneys' fees.  A 1996 study examined all class actions (*i.e.*, not just securities cases) terminated between July 1, 1992, and June 30, 1994, in four federal district courts.  Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 4 (1996). Median fee awards ranged from 27% to 30%, and most awards were between 20% and 40% of the monetary settlement. The following figure summarizes the data:

**Figure 72: Mean and Median Fee-Recovery Rates in Certified Cases Using Percentage of Recovery Method and Providing Net Monetary Distribution to Class**



*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses.

Source: Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 151 (1996).

The findings confirm that fee awards typically cluster around 30 percent for attorneys' fees in all types of litigation in the four federal district courts.

38. A 2004 empirical study on attorney fees in class action settlements by Eisenberg and Miller examined data from another study that first appeared in the March-April 2003 edition of *Class Action Reports* (CAR) which compiled fees awards on 1,120 common fund cases. Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27 (2004). Using the CAR data, the study concluded that the mean fee award for all 630 class action awards examined in common fund cases was 27% and the median fee award was 30%. Table 8 summarizes this data:

Table 8:  Fee-Award Percent Summary by Case Category

| Category | Common Fund Cases | | | |
|---|---|---|---|---|
| | Mean | Median | Std. Dev. | Number |
| Class Action Reports Data (CAR), 1993–2002 | | | | |
| Antitrust | 26.8 | 28.4 | 7.1 | 31 |
| Consumer | 24.3 | 25.0 | 8.5 | 48 |
| Civil rights | 23.5 | 25.5 | 11.0 | 4 |
| Derivative | 33.3 | 33.3 | — | 1 |
| Employment | 25.5 | 25.7 | 7.6 | 17 |
| Environmental | 30.5 | 30.5 | 7.8 | 2 |
| Government regulation | 29.7 | 29.7 | — | 1 |
| Labor/wage/pension | 22.9 | 26.4 | 10.6 | 30 |
| Mass tort | 17.6 | 17.0 | 6.9 | 8 |
| Securities | 27.9 | 30.0 | 7.4 | 483 |
| Taxpayer | 3.5 | 3.5 | — | 1 |
| Utilities | 20.3 | 20.3 | 1.7 | 2 |
| Social welfare/entitlements | 16.9 | 16.9 | 4.4 | 2 |
| Total | 27.0 | 30.0 | 7.9 | 630 |

Sources: Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 *Journal of Empirical Legal Studies* 51 (2004),  analyzing data from Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 *Class Action Rep.* 169 (2003).

39.  A recent study of all available class action settlements from 2006-2007 performed by Professor Brian Fitzpatrick of Vanderbilt University finds that the median and mean fees in the data he studied were approximately 25%.  Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 Journal of Empirical Legal Studies 811-846 (2010).

40.  A 2010 paper by Eisenberg and Miller studied all published class action settlements from 1993 to 2008 in both state and federal courts.  Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248 (2010).  As shown in Table 9, the median attorneys' fee in the entire data set was 24% of the class recovery:

Table 9:  Fee and Class Recoveries, by Locale, 1993-2008

| | Mean ratio | Median ratio | Mean fee | Median fee | Mean gross recovery | Median gross recovery | Number of cases |
|---|---|---|---|---|---|---|---|
| APPEAL | 0.19 | 0.20 | 5.89 | 2.15 | 57.86 | 13.37 | 25 |
| CDCA | 0.25 | 0.25 | 3.93 | 2.75 | 16.30 | 19.90 | 10 |
| DDC | 0.22 | 0.22 | 16.69 | 2.14 | 134.79 | 13.00 | 18 |
| DMA | 0.16 | 0.15 | 11.50 | 7.00 | 118.55 | 81.00 | 10 |
| DMN | 0.25 | 0.27 | 8.77 | 4.75 | 40.99 | 14.25 | 16 |
| DNJ | 0.21 | 0.22 | 32.26 | 7.80 | 503.42 | 36.88 | 35 |
| EDCA | 0.26 | 0.25 | 0.40 | 0.12 | 3.26 | 0.54 | 12 |
| EDLA | 0.26 | 0.23 | 7.79 | 1.77 | 43.53 | 8.61 | 13 |
| EDMI | 0.22 | 0.20 | 6.56 | 1.34 | 34.80 | 11.75 | 17 |
| EDNY | 0.32 | 0.25 | 11.33 | 2.38 | 142.42 | 9.03 | 26 |
| EDPA | 0.28 | 0.29 | 12.66 | 1.51 | 75.79 | 6.88 | 70 |
| MDFL | 0.21 | 0.21 | 3.64 | 2.66 | 18.23 | 14.87 | 12 |
| NDCA | 0.26 | 0.25 | 4.44 | 2.00 | 24.06 | 9.25 | 47 |
| NDIL | 0.24 | 0.24 | 12.14 | 2.75 | 51.45 | 12.50 | 29 |
| Other | 0.24 | 0.25 | 20.47 | 3.25 | 154.98 | 16.38 | 161 |
| SDCA | 0.26 | 0.25 | 4.66 | 1.14 | 63.12 | 4.90 | 10 |
| SDNY | 0.22 | 0.22 | 11.54 | 2.13 | 127.97 | 12.85 | 103 |
| State | 0.20 | 0.20 | 5.94 | 2.00 | 61.61 | 12.32 | 75 |
| Total | 0.23 | 0.24 | 12.84 | 2.33 | 116.01 | 12.50 | 689 |

Sources: Westlaw, LexisNexis, PACER.

The mean fee in the Northern District of California was 26% of the recovery and the median fee was 25%.

41. Empirical research demonstrates that a scaling effect exists in class action cases in the sense that fee percentages tend to go down as the size of the class recovery increases.  It is therefore useful to break results in similar cases down by size of class recovery.  Eisenberg and Miller found, from their study of sixteen years of class action settlements, that the median percentage fee for cases generating recoveries between $8.7 and $14.3 million was 25.0% and the mean fee was 23.8%.  This result is shown in Table 10:

Table 10:  Mean, Median, and Standard Deviation of Fee Percent,
Controlling for Class Recovery Amount, 1993-2008

| Range of class recovery (millions) decile | Mean | Median | Standard deviation | N |
|---|---|---|---|---|
| Recovery <=1.1 | 37.9 | 32.3 | 19.6 | 69 |
| Recovery >1.1 <=2.8 | 27.1 | 26.4 | 9.1 | 69 |
| Recovery >2.8 <=5.3 | 26.4 | 25.0 | 9.8 | 69 |
| Recovery >5.3 <=8.7 | 22.8 | 22.1 | 8.4 | 69 |
| Recovery >8.7 <=14.3 | 23.8 | 25.0 | 8.1 | 69 |
| Recovery >14.3<=22.8 | 22.7 | 23.5 | 7.5 | 69 |
| Recovery >22.8 <=38.3 | 22.1 | 24.9 | 8.7 | 68 |
| Recovery >38.3 <=69.6 | 20.5 | 21.9 | 10.0 | 70 |
| Recovery >69.6 <=175.5 | 19.4 | 19.9 | 8.4 | 69 |
| Recovery >175.5 | 12.0 | 10.2 | 7.9 | 68 |

Source: Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248-281 (2010).

42. Another important consideration bearing on the reasonable percentage fee is the risk of the case.  Risk is relevant because, within appropriate limits, it justifies a higher-than-normal fee in successful cases in order to compensate counsel for the cases that fail.  Empirical data confirm that risk is a relevant factor in class action attorneys' fees.  Both of the Eisenberg and Miller papers mentioned above found that, holding other factors constant, risk was significantly and positively associated with fee awards: the more risk, the higher the fee.

43. This litigation posed significant risks for class counsel, who undertook this representation entirely on a contingent basis.  Class certification was an issue, given disparate credit histories, different disclosures, and varying degrees of sophistication among members of the class.  Establishing Defendant's liability under the FCRA was even more problematic.  Equifax could argue, with some plausibility, that the credit reports in issue were not inaccurate or unclear because other features of the account description accurately and clearly described the conditions of the account in question.  Even if Plaintiffs could establish that the reports were inaccurate or unclear, they would have had to establish at trial that Equifax acted "willfully"-- a

high burden, and one which may have proved impossible to surmount.  If willfulness was not

established, Plaintiffs would not have been able to claim statutory damages.

Kerr Factors

44. I now address the factors relevant to determining a reasonable fee under

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), cert. denied, 425 U.S. 951

(1976):[3]

(a)  Time and labor required.  This matter is discussed above in the analysis of the

lodestar fee.  The record reflects that the parties fought vigorously for the duration of the action.

Both sides were clearly committed to the prosecution and defense of this action.  Plaintiffs'

counsel spent more than 3,600 hours for an approximate lodestar of $1.5 million.

(b)  Novelty and difficulty of the issues presented.  Although Plaintiffs' counsel were

confident of their positions, there was a lack of certainty as to the merits of the FCRA claims

asserted and considerable question of whether Equifax's conduct constituted a "willful" violation

of the FCRA.  Equifax vigorously defended its file disclosure procedures and denied that

willfulness could be shown.  Plaintiffs prepared and filed five complaints, opposed Defendant's

motion to dismiss their asserted claims for injunctive relief under the FCRA, litigated motions

for protective orders, conducted extensive discovery, and prepared a motion to certify that was

not filed because a settlement was reached on its due date.  The parties only reached settlement

after several weeks of negotiations which had succeeded two mediations and an in-person

settlement conference.  There was also intense settlement negotiations between each of the

settlement conferences and mediation.

---

[3] Several of these factors, including the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained, are incorporated in the lodestar calculation and accordingly do not provide an independent basis for determining an appropriate fee.

(c) <u>Skill requisite to perform the legal service properly.</u>  Effective litigation of this case required review and extensive knowledge of the FCRA, the FCRA's requirements for the provision of file disclosures to consumers, the credit reporting industry's practices and procedures for the reporting of consumer credit information, the maintenance of consumer credit files, and the production of file disclosures and consumer reports.

(d) <u>Preclusion of other employment by the attorney due to acceptance of the case.</u>  Plaintiffs' counsel were required to forego other litigation in order to focus on this case, and in fact during certain parts of this litigation found it necessary to devote themselves nearly full time to the matter, thus precluding other fee-generating work.  Based upon the number of hours Plaintiffs' Counsel spent on this action, as discussed above, their ability to accept other cases must have been significantly affected.  This is particularly true of Plaintiffs' Counsel, each of whom is either a solo practitioner or a member of a law firm composed of two to six attorneys.

(e) <u>Customary fee.</u>  This matter is addressed above in the paragraphs on the lodestar and percentage fee calculations.

(f) <u>Whether the fee is fixed or contingent.</u>  Plaintiffs' counsel litigated this case entirely on a contingent basis and stood to lose the entire value of their investment of time and resources in this case if the matter had not generated a favorable settlement for the class.

(g) <u>Time limitations imposed.</u>  This case imposed significant time limitations, spanning approximately three years and more than 4,000 hours.

(h) <u>Amount involved and results obtained.</u>  This matter is addressed above in the discussion of the percentage fee.  As noted above, even though any valuation of the settlement relief must be made with caution, the pecuniary value of relief obtained through this settlement can be estimated at $10,824,000.  The value of the change of procedures, which benefits many

thousands of people not members of the class, cannot be estimated but clearly is a significant part of the overall settlement package.

(i) The experience, reputation and ability of the attorneys. Plaintiffs' Counsel are experienced in class action litigation other forms of representative actions, and the litigation of FCRA claims. I have reviewed the work product and qualifications of Plaintiffs' counsel and find that they reflect a high quality of representation of the class – as does the result achieved.

(j) The "undesirability" of the case. This case presented features that reduced its desirability from the standpoint of plaintiffs' attorneys: the economic power and sophistication of the Defendant; the need to show that the Defendant acted willfully or recklessly as a precondition to obtaining statutory damages; Defendant's defense that it had fully complied with the law; and the fact that statutory damages were going to be difficult if not impossible to establish.

(k) The nature and length of professional relationship with the client. Plaintiffs' counsel do not have longstanding professional relationships with the named plaintiffs, but their practices are devoted to representing consumers and in this respect can be said to have an ongoing relationship with consumer clients.

(l) Awards in similar cases. This matter is addressed in the paragraphs above on the lodestar and percentage fee calculations. In addition, the requested fee in this case is reasonable when compared with fees awarded in other similar litigation against credit rating agencies. Comparable FCRA class action settlements include: *Gillespie v. Equifax*, *White v. E-loan*, *Chakejian v. Equifax*, *In re: The Progressive Insurance Corp. Underwriting and Rating Practices Litigation*, and *Pike/White/Hernandez*. In *Pike/White/Hernandez*, the court approved an agreed upon fee request for $6,000,000, based on a lodestar analysis, as part of an injunctive relief only settlement reached in that FCRA class action. In *Gillespie v. Equifax*, the court

approved the lodestar based fee of $932,000 which was agreed to by the parties and represented an agreed upon discount from Plaintiffs' counsel's lodestar.  Like *Gillespie*, the instant action challenged certain features of Equifax's file disclosure practices and produced a proposed settlement intended to promote the accuracy and clarity of file disclosures, thus enforcing a core purpose of the FCRA.  Notably, in *Gillespie*, atypically the vast majority of the work was performed by one plaintiff's attorney, working with local counsel.  In the case at bar, Plaintiffs' were represented by a much more typical class action legal team: two lead counsel experienced in prosecuting consumer class action and other representative actions, local counsel, and two other attorneys who possess expertise with issues under the FCRA.

### Expenses

45.  In addition to requesting an award of fees, counsel will request an award of costs and expenses of approximately $80,000.  This award is reasonable when judged by awards in similar cases.

46.  Eisenberg and Miller's 2004 study found that for 232 cases from 1993 to 2002 for which cost data were available, mean costs were 2.8% of the recovery and median costs were 1.7%.  Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 51 (2004).  Median costs were 16.7% of the fee award and mean costs were 10.7% of the fee award. Eisenberg and Miller's 2010 study, which updated the data through 2008, found for 304 cases from 2003 to 2008, mean costs were 2.7% of the recovery and median costs remained at 1.7%.  Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248-281 (2010).

47.  An award of $80,000 in costs and expenses in the present case amounts to 6.1% of the requested $1,307,681.30 fee, a reasonable sum when judged against the median of 16.7% and

mean of 10.7% of the fee award reported in Eisenberg's and Miller's 2004 study. This award represents 0.7% of an estimated class benefit of $10,824,000. These percentages are below the mean and median costs as a percentage of the recovery reported in the Eisenberg-Miller studies.

Conclusion

For the reasons stated above, it is my conclusion that the requested award for attorneys' fees and expenses in the amount of $1,380,000 is reasonable when evaluated in light of awards in similar cases.

Geoffrey P. Miller
February 15, 2011

## Appendix A: Materials Reviewed

(1)  Fourth Amended Class Action Complaint;

(2)  Defendant Equifax Information Services LLC's Answer to Plaintiffs' Fourth Amended Class Action Complaint;

(3)  Defendant's Notice of Motion and Motion to Dismiss; Memorandum of Points and Authorities in Support Thereof; Declaration of J. Anthony Love; and [Proposed] Order, *Villaflor v. Equifax*, Case No: 2:08-cv-01481 FMC (C.D. Ca.);

(4)  Declaration of John Anthony Love, *Villaflor v. Equifax*, Case No: 2:08-cv-01481 FMC (C.D. Ca.);

(6)  Plaintiffs' Omnibus Statement About Defendant's Motion to Transfer; and Memorandum in Opposition to Motion to Dismiss, *Villaflor v. Equifax*, Case No: 2:08-cv-01481 FMC (C.D. Ca.);

(7)  Plaintiffs' and FB Legal, LLC's Motion For Protective Order And Objections to Subpoena For Rule 30(B)(6) Deposition Duces Tecum, With Incorporated Memorandum of Law;

(8)  Notice of Motion for Protective Order;

(9)  Reply Brief Re Plaintiffs' Motion for Protective Order;

(10)  Order Granting Plaintiffs' Motion for Protective Order;

(11)  Settlement Agreement;

(12)  Plaintiffs' Memorandum of Points And Authorities Supporting Unopposed Motion for Preliminary Approval of Proposed Class Settlement and Directing Notice to Class;

(12)  Order Granting Preliminary Approval To Proposed Class Action Settlement; Conditionally Certifying Settlement Class; Approving Class Notice; Appointing Class Counsel; and Scheduling Final Approval Hearing Date And Related Dates;

(13)  Draft of Plaintiffs' memorandum supporting [unfiled] motion to certify;

(14)  Plaintiffs' Counsels' time records; and

(15)  Docket report, .*Villaflor v. Equifax*, Case No: 3:09-cv-00329 MMC (N.D. Ca.)

1

**Appendix B:  Resume**

2

**GEOFFREY P. MILLER**

3

4

New York University Law School
5 | 40 Washington Square South Suite 411G
New York, New York 10012
6 | (212) 998-6329 (office)
(212) 995-4659 (fax)
7 | geoffrey.miller@nyu.edu

8 | Work Experience

9 | New York University Law School (1995-present)
Stuyvesant P. Comfort Professor of Law
10 | Director, NYU Center for the Study of Central Banks and Financial Institutions (1994-present)
Co-Director, NYU Center for Law, Economics and Organization (2006-present)
11 | Co-Founder and Co-President, Society for Empirical Legal Studies (2006-2007)
Chair, Academic Personnel Committee (1999-2000; 2004-2006)
12 | Chair, Promotions and Tenure Committee (2007-2009)

13 | University of Chicago Law School (1983-1995)
Kirkland & Ellis Professor (1989-1995)
14 | Editor, Journal of Legal Studies (1989-1995)
Director, Program in Law and Economics (1994-1995)
15 | Director, Legal Theory Workshop (1989-1993)
Associate Dean (1987-1989)
16 | Professor of Law (1987-1989)
Assistant Professor of Law (1983-1987)

17

18 | Faculty Member, Study Center Gerzensee, Switzerland, Spring 2012 (invited)
Visiting Lecturer, University of Genoa Department of Law, Spring 2011 (invited)
19 | Visiting Scholar, European University Institute, Florence Italy, Fall/Winter 2010
Visiting Chair on Private Actors and Globalisation, Hague Institute for the Internationalisation
20 |     of Law, Fall/Winter 2010
Robert B. and Candace J. Haas Visiting Professor of Law, Harvard Law School,
21 |     Fall 2009
Max Schmidheiny Guest Professor, University of St. Gallen, Switzerland
22 |     Summer 2009
Fresco Endowed Professor of Law, University of Genoa, Italy, Summer 2008,
23 |     Spring 2009, Summer 2010
Visiting Scholar, University of Minnesota Law School, Spring 2008
24 | Visiting Lecturer, University of Bolzano, Italy, Summer 2007
Commerzbank Visiting Professor, Institute for Law & Finance, University of
25 |     Frankfurt, Germany, Summer 2004, Summer 2005, Summer 2010
Visiting Professor, Columbia Law School, Fall 2001
26 | Visiting Professor, University of Sydney, Australia, Summer 2002; Summer 2006;
    Spring 2009
27 | Zaeslin Visiting Professor, University of Basel, Switzerland, Summer 2001, 2002, 2003,
    2004, 2005, 2007, 2008, 2009, 2010, 2011 (invited)
28

23

Visiting Scholar, CentER for Economic Research, Tilburg, Holland, Summer 1996
John M. Olin Visiting Scholar, Cornell University Law School, Summer 1992,
  Spring 1996; Winter 1997, Summer 2005, Spring 2008, Spring 2009, Spring 2010
Visiting Scholar, Bank of Japan, Spring 1995
Visiting Professor, New York University Law School, Fall 1994
Consultant, Federal Reserve Bank of Chicago, 1992-1994
Visiting Scholar, New York University Law School, Fall 1993
Simpson Grierson Butler White Visiting Professor, University of Aukland,
  New Zealand, Summer 1993

Associate, Ennis, Friedman, Bersoff & Ewing
Washington, D.C. (1982-83)

Attorney Adviser, Office of Legal Counsel
U.S. Department of Justice (1980-82)

Clerk, Hon. Byron R. White
Supreme Court of the United States (1979-80)

Clerk, Hon. Carl McGowan
U.S. Court of Appeals, District of Columbia (1978-79)

## Corporate Service

Member of the Board of Directors, State Farm Bank (2010) – board and committee service for nontraditional thrift institution with $15 billion in assets.

## Education

Columbia Law School, J.D. (1978)
Editor-in-Chief, Columbia Law Review (1977-78)
Princeton University, A.B. *magna cum laude* (1973)

## Publications

## Books

Ways of a King: Legal and Political Ideas in the Bible (manuscript 2011)

Trust, Risk, and Moral Hazard in Financial Markets (Il Mulino, 2011) (forthcoming)

The Origins of the Necessary and Proper Clause (with Gary Lawson, Robert Natelson, and Guy Seidman) (Cambridge University Press 2010)

The Economics of Ancient Law (editor) (Edward Elgar 2010)

Bank Mergers and Acquisitions (editor, with Yakov Amihud) (Kluwer Academic Publishers 1998)

La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure] (in Spanish) (editor, with Ernesto Aguirre and Roberto Junguito Bonnet) (Tercer Mundo: Bogotá 1997)

Costly Policies: State Regulation and Antitrust Exemption in Insurance Markets (AEI Press 1993) (with Jonathan R. Macey)

24

Banking Law and Regulation, Little, Brown & Co. 1992 (with Jonathan R. Macey); Second Edition, Aspen Law & Business 1997 (with Jonathan R. Macey), Third Edition, Aspen Law & Business 2001 (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan R. Macey), under title "The Law of Banking and Financial Institutions"

Banking Law and Regulation: Statutory and Case Supplement (Little, Brown & Co. 1992; Second Edition, Aspen Law & Business, 1997) (with Jonathan R. Macey), Third Edition, Aspen Law & Business, 2000) (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan Macey)

Banking Law and Regulation: Teacher's Manual (1992; Second Edition 1997; Third Edition 2001, Fourth Edition 2008) (with Jonathan R. Macey and Richard Scott Carnell)

Articles

Legal Ethics/Legal Profession

The English vs. the American Rule on Attorneys Fees: An Empirical Study of Attorney Fee Clauses in Publicly-Held Companies' Contracts (manuscript 2010) (with Theodore Eisenberg)

Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010) (with Theodore Eisenberg)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007)

From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005)

Bad Judges, 83 Texas Law Review 431 (2004)

Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg)

Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005)

Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003)

Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation: Prosecution & Defense Strategies (2003)

Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey)

Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998)(with Michael Klausner and Richard Painter)

Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998)

An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004)

Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey)

Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987)

### Civil Procedure

Group Litigation in the Enforcement of Tort Law, in Jennifer Arlen, ed., The Economics of Torts (forthcoming 2011)

The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, 63 Vanderbilt Law Review 107 (2010) (with Charles Silver)

Will Aggregate Litigation Come to Europe?, 62 Vanderbilt Law Review 177-210 (2009) (with Samuel Issacharoff)

Preliminary Judgments, 2010 University of Illinois Law Review 165 (2009)

A New Look at Judicial Impact:  Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., 29 Washington University Journal of Law & Policy 5-35 (2009) (with Theodore Eisenberg and Michael Perino)

Punti cardine in tema di class action negli Stati Uniti e in Italia (Cutting-Edge Issues in U.S. and Italian Class Action Litigation), 2008 Analisi Giuridica dell'Economia 211-230 (2008)

Compensation and Deterrence in Consumer Class Actions in the United States, in Fabrizio Cafaggi and Hans W. Micklitz, eds., New Frontiers in Consumer Protection: The Interplay Between Private and Public Enforcement 263-282 (2009)

Pleading after *Tellabs*, 2009 Wisconsin Law Review 507-534 (2009)

Mandatory Arbitration for Customers But Not For Peers, 92 Judicature 118-123 (2009) (with Theodore Eisenberg and Emily Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 41 University of Michigan Journal of Law Reform 871-96 (2008) (with Theodore Eisenberg and Emily Sherwin); reprinted in 7 ICFAI University Journal of Alternative Dispute Resolution (Hyderabad, India)

Reversal, Dissent, and Variability in State Supreme Courts: The Centrality of Jurisdictional Source, 89 Boston University Law Review 2009 (2009) (with Theodore Eisenberg)

All-or-Nothing Versus Proportionate Damages, 38 Journal of Legal Studies 345-382 (2009) (with Shmuel Leshem)

Judicial Review of Class Action Settlements, 1 Journal of Legal Analysis 167-205 (2008) (with Jonathan R. Macey)

Do Juries Add Value? Evidence From an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 Journal of Empirical Legal Studies 539 (2007) (with Theodore Eisenberg)

The Flight from Arbitration: An Empirical Study of *Ex Ante* Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul Law Review 335 (2007) (with Theodore Eisenberg), reprinted in 49 Corporate Practice Commentator323 (2007)

Rethinking Certification and Notice in Opt-Out Class Actions, 74 University of Missouri Kansas City Law Review 637 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006) (with Theodore Eisenberg)

Review of the Merits in Class Action Certification, 33 Hofstra Law Review 51 (2004)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt Law Review 1529 (2004) (with Theodore Eisenberg)

Competing Bids in Class Action Settlements, 31 Hofstra Law Review 633-650 (2003)

On the Costs of Civil Justice, 80 University of Texas Law Review 2115 (2002)

Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 Tulane Law Review 681 (2000)

Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman, 73 New York University Law Review 1167-1178 (1998)

Nonpecuniary Class Action Settlements, 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer)

Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998)

The Legal-Economic Analysis of Comparative Civil Procedure, 45 American Journal of Comparative Law 905-19 (1997)

Overlapping Class Actions, 71 New York University Law Review 514 (1996)

Settlement of Litigation: A Critical Retrospective, in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996)

Expanding on the Fifty Percent Hypothesis: A Multimodal Approach to the Selection of Cases for Litigation, 25 Journal of Legal Studies 233 (1996) (with Daniel Kessler and Thomas Meites)

A Market Approach to Tort Reform Via Rule 23, 80 Cornell Law Review 909 (1995) (with Jonathan R. Macey)

Settlement Escrows, 24 Journal of Legal Studies 87 (1994) (with Robert Gertner)

Introduction: Economic Analysis of Civil Procedure, 23 Journal of Legal Studies 303 (1994)

Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey)

The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997)

Some Thoughts on the Equilibrium Hypothesis, 69 Boston University Law Review 561 (1989)

Some Agency Problems in Settlement, 16 Journal of Legal Studies 189 (1987)

An Economic Analysis of Rule 68, 15 Journal of Legal Studies 93 (1986)

The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989)

Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Columbia Law Review 127 (1977)

Corporate, Contract and Securities Law

A Modest Proposal for Fixing Delaware's Broken Duty of Care, 2010 Columbia Business Law Review 319 (2010)

Un-manifested Harm in Business-to-Business Cases, __ Journal of Theoretical and Institutional Economics __ (forthcoming)

Process as Currency with the Courts: Judicial Scrutiny of Directors' Decisions, 1 International Journal of Corporate Governance 337-365 (2010) (with Jonathan R. Macey)

A Simple Theory of Takeover Regulation in the United States and Europe, 42 Cornell International Law Journal 301 (2009) (with Guido Ferrarini), reprinted in 55 Rivista Delle Societá 680 (2010)

Bargains Bicoastal: New Light on Contract Theory, 31 Cardozo Law Review 1475 (2010)

Flight to New York: an Empirical Analysis of Choice of Law and Forum Selection Clauses in Large Commercial Contracts, 30 Cardozo Law Review 1475 (2009) (with Theodore Eisenberg)

The Market for Contracts, 30 Cardozo Law Review 2073 (2009) (with Theodore Eisenberg)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt Law Review 1975 (2006) (with Theodore Eisenberg)

Catastrophic Failures: Enron and Beyond, 89 Cornell Law Review 423-455 (2004)

Capital Markets on the Internet: An Introduction, 5 New York University Journal of Legislation and Public Policy 1 (2001-2002)

Das Kapital: Solvency Regulation of the American Business Enterprise, in Eric Posner, ed., Chicago Lectures in Law and Economics 65-81 (2000)

Takeovers: English and American, 6 European Financial Management 533-542 (2000)

Choice of Law as a Pre-Commitment Device, in F.H. Buckley, ed., The Fall and Rise of Freedom of Contract 357-69 (Duke University Press 1998)

On the Advantages of Defined Contribution Plans, in Samuel Estreicher, ed., Proceedings of the 50th Annual Conference on Labor (Kluwer Academic Press, forthcoming 1998)

Political Structure and Corporate Governance: Some Points of Contrast Between the U.S. and the U.K., 1998 Columbia Business Law Review 51-78 (1998), reprinted in Sloan Project on Corporate Governance at Columbia Law School, Corporate Governance Today 629-648 (1998)

Finance and the Firm, 152 Journal of Institutional and Theoretical Economics [Zeitschrift fur die Gesamte Staatswissenschaft] 89-107 (1996)

Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan and the United States, 48 Stanford Law Review 73 (1995) (with Jonathan R. Macey)

Comment on "Brokerage, Market Fragmentation, and Securities Market Regulation," in Andrew W. Lo, ed., The Industrial Organization and Regulation of the Securities Industry, University of Chicago Press (1996)

Corporate Stakeholders: A Contractual Perspective, 43 University of Toronto Law Review 401 (1993) (with Jonathan R. Macey)

The Culture of Capital: Comments on Conley and O'Barr, 71 North Carolina Law Review 201 (1992)

The Economic Efficiency of Close Corporation Law: A Comment, 70 Washington University Law Quarterly 399 (1992)

Lessons from Financial Economics: Materiality, Reliance, and the Utility of Empirical Methodology in Extending the Reach of Basic v. Levinson, 77 Virginia Law Review 1015 (1991) (with Jonathan R. Macey, Jeffrey Netter, and Mark Mitchell)

The Fraud on the Market System Revisited, 77 Virginia Law Review 999 (1991) (with Jonathan R. Macey)

Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan, 139 University of Pennsylvania Law Review 369-453 (1990) (with David Litt, Jonathan R. Macey, and Edward L. Rubin)

Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory, 42 Stanford Law Review 1059 (1990) (with Jonathan R. Macey)

Trans-Union Reconsidered, 98 Yale Law Journal 127 (1988)(with Jonathan R. Macey)

Toward an Interest Group Theory of Delaware Corporate Law, 65 Texas Law Review 469 (1987) (with Jonathan R. Macey)

<u>Constitutional Law</u>

The President's Power of Interpretation: Implications of a Unified Theory of Constitutional Law, 56 Law and Contemporary Problems 35 (1993)

The Unitary Executive in a Unified Theory of Constitutional Law: The Problem of Interpretation, 15 Cardozo Law Review 201 (1993)

Liberty and Constitutional Architecture: The Rights-Structure Paradigm, 16 Harvard Journal of Law & Public Policy 87 (1993)

Rights and Structure in Constitutional Theory, 8 Social Philosophy & Policy 196 (1991), reprinted in E. Frankel Paul, ed., Reassessing Civil Rights (1991)

The Appropriations Power and the Necessary and Proper Clause, 68 Washington University Law Quarterly 640 (1990) (panel)

From Compromise to Confrontation: Separation of Powers in the Reagan Era, 57 George Washington Law Review 401 (1989)

Rediscovering Economic Liberties, 41 Rutgers Law Review 773 (1989) (panel)

War Powers and the Constitution: A Middle Ground, 43 University of Miami Law Review 35 (1988) (panel)

The Debate Over Independent Agencies in Light of the Empirical Evidence, 1988 Duke Law Journal 215 (1988)

Independent Agencies, 1986 Supreme Court Review 41 (1986)

### Financial Institutions

Financial Private Regulation and Enforcement (manuscript, 2010)

Intellectual Hazard and the Design of Financial Stability Regulation, in University of St. Gallen Series in Law and Economics, Peter Nobel, ed. (Zurich: Schulthess, 2010) (with Gerald Rosenfeld)

Intellectual Hazard: How Conceptual Biases in Complex Organizations Contributed to the Crisis of 2008, 33 Harvard Journal of Law & Public Policy 807 (2010) (with Gerald Rosenfeld)

Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, 34 Journal of Corporation Law 789 (2009) (with Jonathan Macey, Maureen O'Hara and Gabriel D. Rosenberg)

The Basel Committee, Global Administrative Law, and the Developing World, in Benedict Kingsbury and Richard Stewart, eds, India, the South and the Shaping of Global Administrative Law  (forthcoming, Oxford University Press India 2008) (with Michael Barr)

Comment: Credit Risk Transfer, Hedge Funds, and the Supply of Liquidity, in Peter Nobel and Marina Gets, eds., Law and Economics of Risk in Finance, University of St. Gallen Series in Law and Economics 73 (2008)

Global Administrative Law – The View from Basel, 17 European Journal of International Law 15 (2006) (with Michael Barr)

Three Myths about Central Banks, Federal Reserve Bank of Cleveland Economic Commentary (November 2002)

Central Bank Independence in Ordinary and Extraordinary Times, in Jan Kleiniman, ed., Central Bank Independence: the Economic Foundations, the Constitutional Implications, and Democratic Accountability (Kluwer Academic Press 2000) 31-51 (with Rosa Lastra)

External Review of Central Bank Decisions, in 1 International Monetary Fund,  Current Developments in Monetary and Financial Law 535-51 (1999)

Bank Mergers and American Bank Competitiveness, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions 175-190 (Kluwer Academic Publishers, 1998) (with Jonathan R. Macey)

Introduction: Bank Mergers and Acquisitions, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions vii-xiii (Kluwer Academic Publishers, 1998)

Deposit Insurance for Economies in Transition, in Kluwers Yearbook of International and Financial Law 103-138 (1997) and R. Lastra and H. Schiffman, eds., Bank Failures and Bank Insolvency Law in Economies in Transition 37-70 (Kluwers Academic Press 1998)

Central Bank Independence, Liberalization and Inflation in Transition Economies: An International Perspective, 49 Journal of Monetary Economics 237 (2002) (with Alex Cukierman and Bilin Neyapti)

An Interest-Group Theory of Central Bank Independence, 27 Journal of Legal Studies 433-453 (June 1998)

On the Obsolescence of Commercial Banking, 154 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 61-73 (1998)

Banking Crises in Perspective: Two Causes and One Cure, in Gerard Caprio, Jr, William C. Hunter, George G. Kaufman, and Danny M. Leipziger, eds.,  Preventing Banking Crises: Lessons from Recent Global Bank Failures 279-287 (Federal Reserve Bank of Chicago, 1998)

Universal Banks are Not the Answer to America's Corporate Governance "Problem": A Look at Germany, Japan, and the U.S., 9 Journal of Applied Corporate Finance 57-73 (1997)(with Jonathan R. Macey), republished in The Revolution in Corporate Finance, Joel M Stern and David H. Chew, editors, Marlden, MA: Blackwell (2003)

Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the "Jusen" Problem, 29 Law and Policy in International Business 1-78 (1998)(pre-published as Washington University School of Law, Working Paper No. 97-3-1) (with Curtis Milhaupt)

Nihon no kin'yu ni okeru jusenmondai hoteki bunsekito keizaiteki bunseki [The Jusen Problem in Japanese Finance: A Legal and Economic Analysis], 1132 Jurisuto 140-49; 1134 Jurisuto 86-92; 1136 Jurisuto 83-89 (1998) (with Curtis Milhaupt) (in Japanese)

A Regulatory Cartel Model of Decisionmaking in Japanese Finance, 4 Zeitschrift fur Japanisches Recht 18-29 (1997)(with Curtis Milhaupt)

Banco de Fondos Mutuos Para América Latina? [Mutual Fund Banking for Latin America?], in La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure], Ernesto Aguirre, Roberto Junguito Bonnet, and Geoffrey Miller, eds. 272-280 (1997) (in Spanish)

The Role of a Central Bank in A Bubble Economy, 18 Cardozo Law Review 1053 (1996)

Decisionmaking at the Bank of Japan, 28 Law and Policy in International Business 1 (1996)

Is Deposit Insurance Inevitable? Lessons From Argentina, 16 International Review of Law and Economics 211 (1996), reprinted in Jagdeep Bandhari and Alan Sykes, eds., Economic Dimensions in International Law: Comparative and Empirical Perspectives 392-404 (Cambridge University Press, 1998)

31

El Papel del Banco Central en una Economia Especulativa [The Role of a Central Bank in a Speculative Economy], in Miguel Mancera Aguayo, ed., El Banco de México en la Reconstrucción Económica Nacional 137 (Centro Cultural Manuel Gómez Morin, A.C., 1996)

Comments on Rajan and James, in A. Saunders & I. Walter, eds., Universal Banking: Financial System Design Reconsidered 330-333 (Irwin & Co. 1996)

Deposit Insurance, the Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities, 12 Yale Journal on Regulation 1-50 (1995)(with Jonathan R. Macey), reprinted as L'Assurance Des Depots, Le Contrat Reglementaire Implicite, et la Destruction des Eschances des Actifs et Passifs Bancaires, 6 Journal des Economistes et des Etudes Humaines 531 (1995)

Double Liability of Bank Shareholders: A Look at the New Data, 28 Wake Forest Law Review 933 (1993) (with Jonathan R. Macey)

Politics of Deposit Insurance Reform: The Case of Argentina, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 473 (1993) and 1 University of Chicago Law School Roundtable 129 (1994), republished as "Políticas de Reforma de Seguro de Depósito. El Caso de la Argentina," in Revista de Derecho Bancario y de la Actividad Financiera, Año 4, Enero-diciembre 1994, No. 19/24, at 221-239 (1995) (Argentine journal)

Comment on Universal Banks and Financial Stability, 19 Brooklyn International Law Journal 197 (1993)

Kaye, Scholar, FIRREA and the Desirability of Early Closure: A View of the Kaye, Scholar Case from the Perspective of Bank Regulatory Policy, 66 University of Southern California Law Review 1115 (1993) (with Jonathan R. Macey)

Constitutional Moments, Pre-commitment, and Fundamental Reform: The Case of Argentina, 71 Washington University Law Quarterly 1061 (1993)

Legal Restrictions on Bank Consolidation: An Economic Analysis, 77 Iowa Law Review 1083 (1992)

The Community Reinvestment Act: An Economic Analysis, 79 Virginia Law Review 291 (1993) (with Jonathan R. Macey)

Drunken Sailors on a Sinking Ship? The Rehnquist Court and the Bank Failure Problem, 1993 Public Interest Law Review 83 (1993)

Comments on Calomiris, in M. Klausner & L. White, eds., Structural Change in Banking 212 (1993)

The McCarran-Ferguson Act: A Case Study of Regulatory Federalism, 68 New York University Law Review 13 (1993), republished in 7 National Insurance Law Review 521 (1995)(with Jonathan R. Macey)(study prepared originally under the auspices of the American Enterprise Institute's Project on Federalism)

Bank Failure: The Politicization of a Social Problem, 45 Stanford Law Review 289 (1992) (with Jonathan R. Macey)

Toward Enhanced Consumer Choice in Banking: Uninsured Depository Facilities as Financial Intermediaries for the 1990s, 1991 N.Y.U. Annual Survey of American Law 865 (1992) (with Jonathan R. Macey)

Nondeposit Deposits and the Future of Bank Regulation, 91 Michigan Law Review 237-273(1992) (with Jonathan R. Macey)

America's Banking System: The Origins and Future of the Current Crisis, 69 Washington University Law Quarterly 769 (1991) (with Jonathan R. Macey)

Bank Failures, Risk Monitoring, and the Market for Corporate Control (with Jonathan R. Macey), 88 Columbia Law Review 1153 (1988) (study conducted under the auspices of the Administrative Conference of the United States)

The Future of the Dual Banking System, 53 Brooklyn Law Review 1 (1987)

Public Policy Implications of Legislation Limiting the Growth of Interstate Banks, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 602 (1986)

Interstate Branching and the Constitution, 41 Business Lawyer 337 (1986)

Interstate Banking in the Court, 1985 Supreme Court Review 179 (1985)

<u>Legal History</u>

The Common Law Origins of the Necessary and Proper Clause, 79 George Washington University Law Review 1 (2010)

*Meinhard v. Salmon,* in Jonathan R. Macey, ed., Corporate Law Stories (2008)

The Industrial Organization of Political Production: A Case Study, 149 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 769 (1993)

Comments on Priest, 36 Journal of Law and Economics 325 (1993)

Toward "Neutral Principles" in the Law: Selections from the Oral History of Herbert Wechsler, 93 Columbia Law Review 854 (1993) (with Norman Silber)

Double Liability of Bank Shareholders: History and Implications, 27 Wake Forest Law Review 31 (1992) (with Jonathan R. Macey)

Origin of the Blue Sky Laws, 70 Texas Law Review 347 (1991) (with Jonathan R. Macey), reprinted in 34 Corporate Practice Commentator 223 (1992)

Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, 77 California Law Review 83 (1989)

The True Story of Carolene Products, 1987 Supreme Court Review 397 (1987), reprinted in Michael J. Glennon, et al., eds., Constitutional Law Anthology (Anderson Publishing 1997), pp. 94-103; reprinted in J. Ely, Property Rights in American History: Reform and Regulation of Property Rights (Garland Publishing 1997), pp. 165-197.

Interviewer, Columbia University Oral History Collection, Life of Herbert Wechsler (1980-1982) (with Norman Silber)

Jurisprudence

The Case of the Speluncean Explorers: Contemporary Proceedings, 61 George Washington Law Review 1798 (1993)

The End of History and the New World Order: The Triumph of Capitalism and the Competition Between Liberalism and Democracy, 25 Cornell International Law Journal 277 (1992) (with Jonathan R. Macey)

The Canons of Statutory Construction and Judicial Preferences, 45 Vanderbilt Law Review 647 (1992) (with Jonathan R. Macey)

Pragmatics and the Maxims of Interpretation, 1990 Wisconsin Law Review 1179 (1990)

Economic Efficiency and the Lockean Proviso, 10 Harvard Journal of Law and Public Policy 401 (1987)

Ancient Law

Logos and Narrative, NYU School of Law, Public Law Research Paper No. 10-78 (2010)

Monarchy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-76 (2010)

Nationhood and Law in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-57 (2010)

Revelation and Legitimacy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-52 (2010)

The Book of Judges: The Hebrew Bible's Federalist Papers, NYU School of Law, Public Law Research Paper No. 10-66 (2010)

Consent of the Governed in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-56 (2010)

Nomadism, Dependency, Slavery and Nationhood: Comparative Politics in the Book of Exodus, NYU School of Law, Public Law Research Paper No. 10-49 (2010)

Economics of Ancient Law, in Geoffrey P. Miller, ed., The Economics of Ancient Law (Edward Elgar, forthcoming 2010)

Patriarchy: The Political Theory of Family Authority in the Book of Genesis (manuscript 2010)

The Dark Age:  How the Biblical Narratives Demonstrate the Necessity for Law and Government (NYU School of Law, Public Law Research Paper No. 10-18)

Origin of Obligation: Genesis 2:4b-3:24 (NYU School of Law, Public Law Research Paper No. 09-60)

Sovereignty and Conquest in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-61 (2010)

34

Golden Calves, Stone Tablets, and Fundamental Law: A Political Interpretation of Exodus 32 (NYU School of Law, Public Law Research Paper No. 10-02)

A Riposte Form in the Song of Deborah, in Tikva Frymer-Kensky, Bernard Levinson and Victor Matthews, eds., Gender and Law in the Hebrew Bible and the Ancient Near East  113-27 (1998)

Foreword: The Development of Ancient Near Eastern Law, 70 Chicago-Kent Law Review 1623 (1996)

Why Ancient Law?, 70 Chicago-Kent Law Review 1465 (1995)(with James Lindgrin and Laurent Mayali)

Foreword: Land Law in Ancient Times, 71 Chicago-Kent Law Review 233 (1996)

The Song of Deborah: A Legal-Economic Analysis, 144 University of Pennsylvania Law Review 2293 (1996)

The Legal-Economic Approach to Biblical Interpretation, 150 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 755 (1994)

J as Constitutionalist: A Legal-Economic Interpretation of Exodus 17:8-16 and Related Texts, 70 Chicago-Kent Law Review 1829 (1995)

Verbal Feud in the Hebrew Bible: Judges 3:12-30 and 19-21, 55 Journal of Near Eastern Studies 105 (1995)

Contracts of Genesis, 22 Journal of Legal Studies 15-45 (1993)

Ritual and Regulation: A Legal-Economic Analysis of Selected Biblical Texts, 22 Journal of Legal Studies 477 (1993)

<u>Law and Society</u>

Parental Bonding and the Design of Child Support Obligations, in William S. Comanor, ed., The Law and Economics of Child Support Payments 210-240 (Edward Elgar 2004)

The Legal Function of Ritual, 80 Chicago-Kent Law Review 1181 (2005)

Handicapped Parking, 29 Hofstra Law Review 81 (2000) (with Lori S. Singer)

Custody and Couvade: The Importance of Paternal Bonding in the Law of Family Relations, 33 Indiana Law Review 691 (2000)

Norm Enforcement in the Public Sphere: The Case of Handicapped Parking, 71 George Washington Law Review 895-933 (2004)

Norms and Interests, 32 Hofstra Law Review 637 (2003)

Female Genital Mutilation: A Cultural-Legal Analysis (manuscript)

Circumcision: A Legal-Cultural Analysis, 9 Virginia Journal of Social Policy and the Law 498-585 (2002), pre-published as New York University Public Law and Legal Theory Working Paper Series, Working Paper 5 (2000)

Law, Pollution, and the Management of Social Anxiety, 7 Michigan Women's Law Journal 221-289 (2001)

Other:

Richard Posner, 61 N.Y.U. Annual Survey of American Law 13 (2004)

Introduction: The Law and Economics of Risk, 19 Journal of Legal Studies 531 (1990) (with Richard A. Epstein)

Law School Curriculum: A Reply to Kennedy, 14 Seton Hall Law Review 1077 (1984) (under pen name of Chris Langdell)

Book Reviews

Defusing the Banks' Financial Time Bomb, BusinessWeek (Mar. 11, 2010) (review of Robert Pozen, Too Big to Save? How to Fix the U.S. Financial System

Love & Joy: Law, Language and Religion in Ancient Israel, by Yochanan Muffs, 58 Journal of Near Eastern Studies 144-45 (1999)

Jesus and the Jews: The Pharisaic Tradition in John; The Trial Of Jesus; Jesus And The Law, by Alan Watson, 1 Edinburgh Law Review 273 (1997)

No Contest: Corporate Lawyers and the Perversion of Justice in America, by Ralph Nader and Wesley J. Smith, Washington Post (October 13, 1996)

The Rise and Fall of the Classical Corporation: Hovenkamp's Enterprise and American Law: 1836-1937, 59 University of Chicago Law Review 1677 (1993)

Property Rights and the Constitution: A Review of James W. Ely, Jr.'s The Guardian of Every Other Right, 37 American Journal of Legal History 378 (1993)

Anatomy of A Disaster: Why Bank Regulation Failed, 86 Northwestern University Law Review 742 (1992)

The Glittering Eye of Law, 84 Michigan Law Review 1901 (1986)

A Rhetoric of Law, 52 University of Chicago Law Review 247 (1985)

Major Lectures

Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Fresco Chair Lectures in Law and Finance, June 2010)

A Simple Theory of Takeover Regulation in the United States and Europe; Intellectual Hazard (Commerzebank Lectures, University of Frankfurt, May 2010)

The European Union's Takeover Directive and Its Implementation in Italy (University of Rome III, 2008)

Catastrophic Financial Failures: Enron, HIH and More (Ross Parsons Lecture, Sydney, Australia, 2002)

Das Kapital: Solvency Regulation of the American Business Enterprise (Coase Lecture, University of Chicago Law School, 1993)

Banking in the Theory of Finance; The Simple Economics of Litigation and Settlement; The Economic Structure of Corporation Law (University of Auckland, New Zealand, 1993)

Journal Referee Reports

American Law and Economics Review
Journal of Legal Studies
Journal of Law, Economics and Organization
Review of Law and Economics

Conferences Organized

Judicial Dialogue on Mass Litigation, Florence Italy, October 15-16, 2010 (co-organizer of conference co-sponsored by NYU Law School, the American Law Institute, and the European University Institute)

Finlawmetrics 2010: Central Banking, Regulation & Supervision after the Financial Crisis  (co-sponsor and member of steering committee)

Finlawmetrics 2009: After The Big Bang:  Reshaping Central Banking, Regulation and Supervision (Milan, Italy, Spring 2009) (co-sponsor and member of steering committee)

NYU Global Economic Policy Forum 2009: The Future of Regulation and Capital Markets (November 5, 2009) (co-organized with Professor Alan Rechtschaffen and with the NYU Law School Alumni Association)

Third Annual Conference on Empirical Legal Studies (Cornell University, Ithaca, New York, Fall 2008) (co-organizer)

NYU Global Economic Policy Forum (April 14, 2007).  Major conference on economic policy.  Keynote address by Jean Claude Trichet, President of the European Central Bank; presentations by Tevi Troy, Deputy Secretary of the Department of Health and Human Services; Kevin Warsh, Member of the Board of Governors of the Federal Reserve System; and Donald B. Marron, Jr., Senior Economic Advisor, President's Council of Economic Advisors.  Co-organized with Professor Alan Rechtschaffen.

Second Annual Conference on Empirical Legal Studies (New York, New York, November 10-11, 2007).  Major conference (425 participants) exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

NYU Global Economic Policy Forum (April 11, 2007).  Major conference on economic policy.  Keynote address by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System; presentations by Stanley Druckenmiller, Founder of Dusquesne Capital, Tevi Troy, Domestic Policy Advisor for President George W. Bush, and Jeffrey Rosen, Vice Chair of Lazard.  Co-organized with Professor Alan Rechtschaffen.

First Annual Conference on Empirical Legal Studies (Austin, Texas, October 2006).  Major conference exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

Conference on Legal Aspects of the International Activities of Central Banks, Lima Peru, October 1997.  This conference, co-sponsored by the central bank of Peru, brought together

37

leaders in the legal and economic issues facing central banks in the management of their external reserves.

Conference on the Governance of Institutional Investors (New York, New York, February 14, 1997). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School Center for the Study of Central Banks, brought together top executives, attorneys, scholars and others interested in the management and organization, both economic and legal, of the nation's large institutional investors, including its mutual fund industry.

Conference on Bank Mergers and Acquisitions (New York, New York, October 11, 1996). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School's Center for the Study of Central Banks, brought together leading academics, lawyers, and investment bankers to discuss some of the broader implications of bank mergers and acquisitions. Co-organizer of this conference was Professor Yakov Amihud of the Stern School's Finance Department.

Conference in Central Banks in Latin America (Bogota, Colombia, February, 1996). This conference, co-sponsored by the central bank of Colombia with technical assistance from the Legal Affairs Department of the International Monetary Fund, brought together leaders of Latin American central banks, the international financial community, and scholars from a variety of disciplines, to discuss issues related to the independence of central banks and economic development.

Conference on Central Banks in Asia (Shanghai, China, October, 1995). This conference, co-sponsored with KPMG-Peat Marwick, brought together leaders from commercial banks, investment banks, and industrial firms, as well as central bankers, to discuss Asian central banks to address issues such as the proposed law granting a degree of independence to the central bank of China.

Conference on Ancient Law (Berkeley, California, March 1995). This conference, organized with Professors James Lindgren of Chicago-Kent Law School and Laurent Mayali of the University of California at Berkeley Law School, brought together important figures from a variety of disciplines interested in Ancient Law. The proceedings are being published as two special issues of the Chicago-Kent Law Review, and as a book published by the Robbins Collection, Berkeley, California.

Conference on Central Banks in Eastern Europe and the Newly Independent States (Chicago, Illinois, April 1994). This conference brought together the Prime Minister of Estonia, three present or former Ministers of Finance of Eastern European states (including Boris Fyoderov, former Finance Minister of the Russian Republic), the heads of the central banks of eleven nations in Eastern Europe and the Newly Independent States, together with a wide variety of highly-placed officials from these countries and from the west, to discuss issues related to the independence of central banks and economic development.

## Professional Memberships and Positions

New York State Bar
District of Columbia Bar
American Bar Association
American Law Institute (1988-1996)
Member, Paolo Baffi Centre Scientific Advisory Board, Milan, Italy (2008- present)
Member, International Academic Council, University of St. Gallen,
    Switzerland (2004-present)
Chairman, Section on Business Associations, American Association of Law

Schools (1995)
Member of the Board of Directors, American Law and Economics Association
(1995-1998)
Member of the Foreign Advisory Committee, Latin American Law and
Economics Association (1995-2000)
Member of the Foreign Advisory Board, Universitad Tocurato Di Tella School of Law,
Buenos Aires, Argentina (1992-1999)
Member of the Editorial Board, Supreme Court Economic Review
Member of the Editorial Board, The Independent Review
Member of the Advisory Board, Yearbook of International Financial and
Economic Law
Member of the Advisory Board, University of Hong Kong Faculty of Law Asian Institute
of International Financial Law (2001-present)
Member of the Advisory Board, LSN Comparative Law Abstracts

<u>Courses</u>

Legal Profession (1985-93; 1996-98; 2003-2007)
The Crisis of 2008 (2009, 2010)
Reading Class: Restructuring Finance (2009)
Property (1986-87)
Corporations (1985-88; 1991-93; 1997-2000; 2005; 2008)
Seminar on Separation of Powers (1985, 1987)
Civil Procedure (1983-84; 2004-2005)
Federal Regulation of Banking (1983, 1989-93; 1995-97; 2003, 2006-2010)
Land Development (1984-85)
Securities Law (1990-91)
Workshop in Legal Theory (1989-91)
Seminar on Financial Institutions (1992-93 (with Merton Miller); 1996-97)
Ethics in Class Action Practice (Continuing Legal Education Seminar 2002-2005)
Law and Economics (University of Basel, Switzerland 2005, 2007, 2008)
Advanced Seminar on Law and Economics (University of Genoa, Italy 2008)
Banking and the Financial Crisis (University of Genoa, Italy 2009)
Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Italy, 2010)
International Banking (University of Sydney, Australia, 2002, 2006)
Introduction to Banking Law (University of Basel, Switzerland 2001, 2002, 2003, 2004, 2009,
2010 (invited))
Banking in the Theory of Finance (University of Frankfurt, Germany 2004, 2005)
Banking Regulation in Crisis (University of Frankfurt, Germany, 2010)

<u>Litigation and Alternative Dispute Resolution</u>

Brief and Reply Brief for Plaintiff-Appellant, <u>Glancy v. Taubman Centers, Inc</u>. No. 03-1609 (6th Cir. 2003).

Amicus Brief for American Bankers Association, et al., <u>In Re: Visa Check/Mastermoney Antitrust Litigation</u>, 280 F.3d 124 (2d Cir. 2001) (of counsel)

Briefed and argued <u>Moran v. Household Finance Corp</u>. (the "Poison Pill" case) in the Supreme Court of Delaware (1985)

Briefed cases in the U.S. Supreme Court, U.S. Court of Appeals, U.S. District Courts, and state trial and appellate courts. Conducted depositions and other pretrial discovery. (1982-1983)

39

Briefed and argued <u>Hodges v. Metts</u>, 676 F.2d 1133 (6th Cir. 1982), on behalf of the United States.

Conducted trial of <u>American Psychological Association v. Birch Tree Press, et al</u> (U.S. District Court, Washington, D.C. 1983).

<u>Deposit Insurance for Thailand</u>.  Prepared a draft deposit insurance law for Thailand, at the request of the International Monetary Fund (1999)

<u>Schatz v. Blanchard</u>.  Neutral arbitrator in a commercial arbitration (2000)

Expert Witness Testimony (past five years)

<u>Lasker v. Kanas (North Fork Bancorporation Litigation)</u>, Index No. 06/103557, Supreme Court of the State of New York, County of New York (2007) (affidavit on fees)

<u>John Hancock Life Insurance Co. v. Goldman, Sachs & Co.</u>, No. 01-10729-RWZ, United States District Court, District of Massachusetts (2007) (declaration on fees)

<u>Comes v. Microsoft Corp.</u>, No. CL8211, Iowa District Court for Polk County (2007) (affidavit on merits relief and affidavit on fees)

<u>Figueroa v. Sharper Image Co.</u>, Case No.: 05-21251, United States District Court, Southern District of Florida (2007) (declaration and testimony on coupon relief).

<u>Love v. Blue Cross & Blue Shield Association, et al.</u>, No. 03-21296-CIV-MORENO/SIMONTON, United States District Court, Southern District of Florida (2007) (declaration in opposition to settlement)

<u>Feuerabend v. UST, Inc.</u>, Case No. 02-CV-7124, Wisconsin Circuit Court for Milwaukee County (2007) (affidavit on fees and settlement; testimony at fairness hearing)

<u>White v. Experian Information Solutions, Inc.</u>, Case No. 05-cv-1070, United States District Court for the Central District of California (2009) (declaration on fairness of settlement and fee award)

<u>In re Trans Union Corp. Privacy Litigation</u>, MDL Docket No. 1350, United States District Court for the Eastern District of Illinois (2008) (declaration on certification)

<u>Hoffman v. American Express</u>, Case No. 2001-022881, Superior Court for the State of California, Alameda County (2008) (deposition on claim preclusion issue)

<u>In re Pet Foods Products Liability Litigation</u>, MDL Docket No. 1850, Civil Action No. 07-2867 (NLH), United States District Court for the District of New Jersey (declaration on attorneys' fees)

<u>Hensley v. Computer Sciences Corp.</u>, No. CV-2005-59-3, Circuit Court of Miller County, Arkansas (2008) (affidavit and deposition on certification)

<u>EM Ltd. and NML Capital, Ltd. v. The Republic of Argentina and Banco de La Nación Argentina</u>, No. 08 Civ 7974 (TPG), United States District Court for the Southern District of New York (declaration and responsive declaration on whether a state-owned financial institution is an alter-ego of the government) (2009); second supplemental declaration (2010)

40

1

   _Tucker v. Scrushy, et al._, Nos. CIV-02-5212, CV 03-3522, CV 03-2023, CV 03-2420, CV 98-6592, Circuit Court of Jefferson County, Alabama, 2008 (affidavit on fees) (2009)

2

   _In Re: 2007 Wildfire Class Litigation_, Master Case No.  2008-00093086, Superior Court of California, County of San Diego (2009) (affidavit and deposition on certification)

3

4

   _In re: Columbia Hospital for Women Medical Center, Inc._, Case No. 09-00010 (Teel, J.), United States Bankruptcy Court for the District of Columbia (declaration on fees) (2009)

5

   _In re Vioxx Products Liability Litigation_, Civil Action No. 2:05-MD-01657-EEF-DEK, United States District Court, Eastern District of Louisiana (affidavit on fee-capping order) (2009)

6

7

   _Chivers v. State Farm Fire & Casualty Co._, NO.: CV-2004-294-3, Circuit Court of Miller County, Arkansas (2008) (affidavit on certification)

8

   _State of Missouri v. SBC Communications, Inc._, No. No. 044-02645, Circuit Court of the City of St. Louis, Missouri (2009) (affidavit on fees)

9

10

   _Alexander v. Nationwide Mutual Insurance Co._, No. CV-2009-120-3, Circuit Court of Miller County, Arkansas (2009) (affidavit on fees)

11

   _Peterman v. North American Company for Life and Health Insurance_, Case No. BC357194, Superior Court of the State of California, County of Los Angeles (2009) (declaration on fees)

12

13

   _Holman v. Student Loan Xpress, Inc._, Case No. 8:08-cv-00305-SDM-MAP (Middle District of Florida, Tampa Division) (2009) (declaration on fees)

14

15

   _Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase_, No. 09-00686 (Southern District of New York) (2010) (declaration on class certification)

16

   _Polion v. Wal-Mart Stores, Inc._, No. 01-03645 (Superior Court of Massachusetts, Commonwealth of Massachusetts) (2010) (declaration on fees; supplemental declaration on fees and motion to strike counsel)

17

18

   _In re MoneyGram International, Inc. Securities Litigation_, No. 08-883 (DSD/JJG), United States District Court, District of Minnesota (2010) (declaration on fees)

19

20

   _Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A._, No. 09-cv-00686 (SAS) (DF), United States District Court for the Southern District of New York (2010) (declaration and deposition on certification)

21

22

   _Coffey v. Freeport-McMoran Copper & Gold, Inc._, No. CJ-2008-68, District Court of Kay County, State of Oklahoma (2010) (affidavit on certification)

23

   _In Re Puerto Rican Cabotage Antitrust Litigation_ MDL Docket No. 3:08-md-1960 (DRD), United States District Court for the District of Puerto Rico (2010) (declaration on fees)

24

25

   _In re XTO Energy Shareholder Class Action Litigation_, No. 352-242403-09, District Court of Tarrant County, Texas, 352nd Judicial District (2010) (affidavit on fees)

26

   _The Board of Trustees of The Southern California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon_, Civil Action No. 09-Cv-06273, Southern District of New York (2011) (declaration on certification)

27

28

41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

_Iorio v. Asset Marketing Systems, Inc._, Case No.: 05-CV-0633-JLS (CAB), Southern District of California (2011) (declaration in fees)

Other Activities

Member, Board of Directors, American Law and Economics Association (1996-1999)

Member, Board of Advisors, The Independent Review (1996-present)

Member, Board of Advisors, Asian Institute of International Financial Law (2001-present)

Member, Editorial Advisory Board, Supreme Court Economic Review (1995-present)

Member, Editorial Advisory Board, The Brookings-Wharton Papers on Financial Policy (1997-present)

President, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1999)

President, Section on Business Associations, American Association of Law Schools (1995)

Member, Board of Contributors, American Bar Association Preview of Supreme Court Cases (1985-1993)

Consultant, Administrative Conference of the United States (1988-89; 1991-1992)

Board of Directors and Volunteer Listener, D.C. Hotline (1980-83)

Awards

1992 Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service, from the Federalist Society for Law and Public Policy Studies

Languages

Reading knowledge of Spanish, French, and Italian.

Personal

Born October 17, 1950

Children Jason (b. 1986) and Forrest (b. 1987).

Shorter Works

Defusing The Banks' Financial Time Bomb: Without Tough Reforms, Writes Robert Pozen, We'll Probably Face An Ugly Repeat of Recent History (Business Week, March 11, 2010)

Why Interstate Banking is in the National Interest, Testimony Before the Subcommittee on Financial Institutions Supervision, Regulation and Deposit Insurance of the House Committee on Banking, Housing and Urban Affairs (September 29, 1993)

Challenging the Concept of the Common Law as a Closed System, Columbia Law School Report, Autumn, 1993 (with Norman Silber)

The Insurance Industry's Antitrust Exemption: A Longstanding Tradition Faces its Greatest Challenge, 1992-93 ABA Preview of Supreme Court Cases 198 (1993)

Shootout at the Escheat Corral, 1992-93 ABA Preview of Supreme Court Cases (1993)

Choices and Chances for Consumers, Legal Times, Oct. 12, 1992, at 29-30.

Impeachment Procedures: An Unexplored Territory in the Separation of Powers, 1992-93 ABA Preview of Supreme Court Cases 39 (1992)

An (Ex)changing of the Guard, 21 Journal of Legal Studies iii (1992)

Revisiting the Contingency Factor in Fee-Shifting Awards, 1991-92 ABA Preview of Supreme Court Cases 327 (1992)

The Foreign Sovereign Immunities Act and the Market for Public International Debt, 1991-92 ABA Preview of Supreme Court Cases 307 (1992)

Return of the Tenth Amendment?: Federal Control and State Autonomy over Low Level Radioactive Wastes, 1991-92 ABA Preview of Supreme Court Cases 284 (1992)

What are the Limits on Congressional Power to Influence Pending Cases?, 1991-92 ABA Preview of Supreme Court Cases 158 (1991)

RICO Standing for Securities Fraud: Does the Purchaser-Seller Rule of Rule 10b-5 Apply?, 1991-92 ABA Preview of Supreme Court Cases 155 (1991)

Banking and Investment: Introduction to UPA Index and Microfiche Collection (University Publications of America 1991)

Source of Strength in the Court: Can Bank Holding Companies be Required to Support Failing Subsidiary Banks?, 1991-92 ABA Preview of Supreme Court Cases 42 (1991)

Source of Strength: A Source of Trouble, Legal Times, September 30, 1991 (Special Supplement, pp. 22-25)

The Once and Future American Banking Industry, The American Enterprise (with Jonathan R. Macey)(1991)

The Former Stockholder as Plaintiff in Short-Swing Trading Cases, 1990-91 ABA Preview of Supreme Court Cases (1991)

Disposing of Demand Excuse in Derivative Litigation, 1990-91 ABA Preview of Supreme Court Cases (1991)

Up in the Air: Can Congress Require States to Appoint Members of Congress to State Agencies?, 1990-91 ABA Preview of Supreme Court Cases 294 (1991)

The Statute of Limitations under Rule 10b-5, 1990-91 ABA Preview of Supreme Court Cases (1991)

Tort Claims Against Federal Banking Agencies: New Hope For Shareholders and Officers of Failed Depository Institutions?, 1990-91 ABA Preview of Supreme Court Cases 94 (1991)

Punitive Damages Redux: If the Eighth Amendment Doesn't Apply, What About the Due Process Clause?, 1990-91 ABA Preview of Supreme Court Cases 47 (1990)

Quandaries of Causation: Proxy Solicitation in Freeze-Out Mergers, 1990-91 ABA Preview of Supreme Court Cases 57 (1990)

Racial Statesmanship, Legal Times S31 (July 23, 1990)

Eurodollars, Sovereign Risk, and the Liability of U.S. Banks for Deposits in Foreign Branches, 1989-90 ABA Preview of Supreme Court Cases 281 (1990)

When is a Note a Note?, 1989-90 ABA Preview of Supreme Court Cases 18 (1990)

Interstate Banking and the Commerce Clause, 1989-90 ABA Preview of Supreme Court Cases 168 (1990)

Federal Courts, Municipalities, and the Contempt Power, 1989-90 ABA Preview of Supreme Court Cases 37 (1989)

Shoe Could Still Drop on Issue of Punitive Damages, National Law Journal (August 21, 1989)

Punitive Damages and the Constitution, 1988-89 ABA Preview of Supreme Court Cases 391 (1989)

States, Bankruptcy and the Eleventh Amendment, 1988-89 ABA Preview of Supreme Court Cases 412 (1989)

Stockholders, Arbitration, and the Securities Act of 1933, 1988-89 ABA Preview of Supreme Court Cases 383 (1989)

Appropriations Riders, Nondisclosure Agreements, and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 375 (1989)

Judicial Appointments and the ABA: Business as Usual or Brand New World?, 1988-89 ABA Preview of Supreme Court Cases 379 (1989)

S & L Receiverships, State Law, and the Federal Courts, 1988-89 ABA Preview of Supreme Court Cases 255 (1989)

The Non-delegation Doctrine in Taxation: A Different Constitutional Calculus?, 1988-89 ABA Preview of Supreme Court Cases 261 (1989)

Bankruptcy, Tax Liens, and Post-Petition Interest, 1988-89 ABA Preview of Supreme Court Cases (1989)

Federal Courts, State Taxes: A Vexing Dilemma For the Enforcement of Civil Rights in a Federal System, 1989-90 ABA Preview of Supreme Court Cases 95 (1988)

Separation of Powers and the Sentencing Commission, 1988-89 ABA Preview of Supreme Court Cases 23 (1988)

Administering the Savings and Loan Crisis: New Problems for the FSLIC, 1988-89 ABA Preview of Supreme Court Cases (1988)

44

Federal Procurement and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 26 (1988)

Thinking About a Career in Law, 1988-89 Talbot's Student Planning Book 32 (1988)

Carl McGowan: A Great Judge Remembered, 56 George Washington Law Review 697 (1988)

Separation of Powers: The Independent Counsel Case Tests the Limits, 1987-88 ABA Preview of Supreme Court Cases 390 (1988)

Decisionmaking in Collegial Bodies, Judicature, April/May 1988

The FDIC, Bank Officers and the Due Process Clause, 1987-88 ABA Preview of Supreme Court Cases 326 (1988)

Farm Foreclosures in Bankruptcy, 1987-88 ABA Preview of Supreme Court Cases 199 (1988)

Equal Access to Justice and Government Litigation, 1987-88 ABA Preview of Supreme Court Cases 160 (1988)

The Time Value of Money in Bankruptcy Cases, 1987-88 ABA Preview of Supreme Court Cases 116 (1987)

Getting the Fee First?: Attorneys and the SSI Program 1987-88 ABA Preview of Supreme Court Cases 118 (1987)

The Farmer and the FDIC, 1987-88 ABA Preview of Supreme Court Cases 48 (1987)

Testing the Limits of Securities Fraud: Financial Gossip in the Court, 1987-88 ABA Preview of Supreme Court Cases 26 (1987)

Checks and Balances in the Twenty-First Century, 33 University of Chicago Law School Record 7 (1987)

Separation of Powers May Become Focus Over NSC, Legal Times, Dec. 15, 1986, at 15

If a Bank is a Broker, is a Brokerage a Branch? 1986-87 ABA Preview of Supreme Court Cases 65 (1986)

Attorney's Fees in the Supreme Court, American Bar Association Journal 40 (November, 1986)

The Contingency Factor in Attorney's Fees Reconsidered, 1986-87 ABA Preview of Supreme Court Cases 20 (1986)

Restitution and Bankruptcy in a Federal System, 1986-87 ABA Preview of Supreme Court Cases (1986)

Don't Limit Contingent Fees, Chicago Tribune, June 11, 1986

The Budget and the Separation of Powers: Gramm-Rudman in the Court, 1985-86 ABA Previews of Supreme Court Cases 359 (1986)

Keeping Attorneys Fees in Proportion, 1985-86 ABA Preview of Supreme Court Cases 325 (1986)

Must the Federal Government Pay Interest on Attorneys Fees Awards?, 1985-86 ABA Preview of Supreme Court Cases 241 (1986)

The Contingency Factor in Attorneys Fees Awards, 1985-86 ABA Preview of Supreme Court Cases 243 (1986)

The FCC as Cop: Forcing State Public Service Commissions to Obey Federal Agency Orders, 1985-86 ABA Preview of Supreme Court Cases 191 (1986)

Preemption, Public Utilities, and Power Over Telephone Rate-Setting, 1985-86 ABA Preview of Supreme Court Cases 187 (1986)

A Bank is a Bank is a Bank -- or is it?, 1985-86 ABA Preview of Supreme Court Cases 67 (1985)

Settlement Offers Conditioned on Waiver of Attorneys' Fees: A Legal and Ethical Dilemma Confronts the Court, 1985-86 ABA Preview of Supreme Court Cases 55 (1985)

Bankruptcy and the Environment: The Case of Hazardous Wastes, 1985-86 ABA Preview of Supreme Court Cases 25 (1985)

A Different Approach to Interstate Banking, American Banker (August 8, 1985)

The SEC as Censor: Is Banning an Investment Advice Newsletter a Prior Restraint of the Press?, 1984-85 ABA Preview of Supreme Court Cases 243 (1985)

Enforcing Federal Rights in State Courts, 1984-85 ABA Preview of Supreme Court Cases 277 (1985)

Interstate Banking and the Constitution, 1984-85 ABA Preview of Supreme Court Cases 364 (1985)

The "Sale of Business" Doctrine in the Supreme Court, 1984-85 ABA Preview of Supreme Court Cases 344 (1985)

Sale of Business Revisited: Does the Doctrine Apply to Partial Sales of Corporate Control, 1984-85 ABA Preview of Supreme Court Cases 347 (1985)

Six Cases Shape Business Law, American Bar Association Journal 124 (Jan. 1985)

Offers of Settlement in Civil Rights Cases Pose Attorneys' Fees Question, 1984-85 ABA Preview of Supreme Court Cases 105 (1984)

Using Bankruptcy to Avoid Liability for Cleaning up Toxic Wastes, 1984-85 ABA Preview of Supreme Court Cases 36 (1984)

A Judicial Footnote Cemented the New Deal, Wall Street Journal, September 13, 1984

May Bank Holding Companies Provide Discount Brokerage Savings?, 1984-85 ABA Preview of Supreme Court Cases 575 (1984)

Blum v. Stenson:  Fundamental Questions About Attorneys' Fees Awards to Public Interest Lawyers, 1984-85 ABA Preview of Supreme Court Cases 301 (1984)

Myths on the Midway, 30 Chicago Law School Record 13 (1984)

Smith v. Robinson:  Another Step Towards Solving the Attorneys' Fees Puzzle? 1983-84 ABA Preview of Supreme Court Cases 437 (1984)

Securities Industry Association v. Board of Governors:  Can Banks Distribute Commercial Paper? 1983-84 ABA Preview of Supreme Court Cases 425 (1984)

The "7-Eleven" Case:  Arbitration v. Litigation in a Federal System, 1983-84 ABA Preview of Supreme Court Cases 161 (1983)

The Bildisco Case:  Reconciling Federal Bankruptcy and Labor Policies, 1983-84 ABA Preview of Supreme Court Cases 169 (1983)

The "Daily Income Fund" Case:  What Role Should a Mutual Fund's Board of Directors Play in Disputes over Investment Advisor Fees, 1983-84 ABA Preview of Supreme Court Cases 107 (1983)

Pulliam v. Allen:  Should State Judges who Act Unconstitutionally Pay the Plaintiff's Attorneys' Fees?, 1983-84 ABA Preview of Supreme Court Cases 115 (1983)

"Shortsighted" Bill Proposes D.C. Court Divestiture, Legal Time of Washington, August 16, 1982

The Tax Bill May Be Unconstitutional, Baltimore Sun, August 16, 1982 (with Donald N. Bersoff)